# 24-3140-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



LOANS ON FINE ART LLC,

*Petitioner-Appellee,*

ART FUND III LLC, COLORADO ART HOLDINGS LLC,
GB FUND LLC, LOTUS INVESTMENT CORP.,

*Consolidated-Petitioners-Appellees,*

*(Caption Continued on the Reverse)*

———————

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR
## RESPONDENTS-APPELLANTS

Matthew J. Press
PRESS KORAL LLP
*Attorneys for Respondents-Appellants*
7 World Trade Center, 46th Floor
New York, New York 10007
212-922-1111



_v._

IAN S. PECK, ACG ARRANGEMENT SERVICES LLC, ACG CAPITAL COMPANY, LLC, MODERN ART SERVICES, LLC, PEGASUS CREDIT COMPANY LLC,

_Respondents-Appellants,_

PATRIOT CREDIT COMPANY LLC,

_Respondent._

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO F.R.A.P. 26.1(a)

   Counsel for Respondents-Appellants certifies that ACG Arrangement Services LLC, ACG Capital Company LLC, Modern Art Services, LLC, Pegasus Credit Company LLC  have no parent corporation, subsidiaries and/or affiliates and that no publicly held corporation owns 10% or more of their stock.

Dated: March 11, 2025

                         PRESS KORAL LLP

         BY:    /s/ Matthew J. Press

                Matthew J. Press
                7 World Trade Center, 46th Floor
                New York, New York 10007
                212-922-1111
                mpress@presskoral.com

                *Attorneys for Respondents-Appellants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>:

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .......................................................7

ISSUES PRESENTED FOR REVIEW ..................................................7

STATEMENT OF THE CASE................................................................8

STATEMENT OF FACTS .....................................................................9

      **A.**     **Greenberg Dupes ACG Into Making a Bad Loan** .................9

      **B.**     **The Parties Discuss Settlement** ................................................9

      **C.**     **The Parties Jointly Retain Robert Simon to Evaluate the Painting** ..................................................................................10

      **D.**     **ACG Enters into an Agreement to Purchase the Painting from Bonito**...........................................................................12

      **E.**     **The Settlement Agreement**....................................................12

      **F.**     **Due to Bonito's Duplicity, ACG is Unable to Meet the Original Evaluation, Consignment and Auction Deadlines** 15

      **G.**     **Greenberg Commences the Arbitration with JAMS**...........16

      **H.**     **The Arbitrator Awards Summary Disposition on Liability and Sets a Hearing on Damages** ..............................................16

      **I.**     **Dr. Hunter's Prior 2019 Appraisal of the Painting** ............17

      **J.**     **Greenberg Submits Dr. Hunter's Fraudulent 2021 Appraisal**...........................................................................18

      **K.**     **ACG Learns of Dr. Hunter's Prior 2019 Appraisal of the Painting** ..................................................................................21

      **L.**     **Dr. Hunter's Specious Claims About the 2019 Appraisal** ..21

      **M.**     **The Arbitrator Refuses to Hear Evidence on the Concealment of Winston Art Group's Prior Valuation of the Painting** ...........................................................................22

N.     **The Painting is Sold in a Sotheby's Auction for $1.8 Million**22

O.     **The Arbitrator Refuses to Hear Evidence on the Concealment of the Prior Winston Art Valuation** ...............23

P.     **Dr. Hunter Admits he Overvalued the Painting but Provides no New Valuation** .....................................23

Q.     **The Arbitrator States that Awarding Damages Based on the Market Price of the Painting at the Sotheby's Auction "Leaves Me Cold"** ..................................................24

R.     **The Arbitrator Intentionally Disregards Black-letter Law on the Effect of an Integration Clause in a Contract to Credit Alleged Prior Representations on the Condition of the Painting** .........................................................25

S.     **The Magistrate's Erroneous Report and Recommendation**29

T.     **The District Court Adopts the Report and Recommendation Without a Reasoned Opinion** .................................32

U.     **The District Court's Subsequent Written Opinion and Judgment** ....................................................32

ARGUMENT .................................................................33

I.     STANDARD OF REVIEW .......................................33

II.     THE COURT SHOULD VACATE THE AWARD BECAUSE THE ARBITRATOR MANIFESTLY DISREGARDED THE UNAMBIGUOUS TERMS OF THE PARTIES' CONTRACT AND THE LAW OF MERGER CLAUSES .................34

A.     THE ARBITRATOR DISREGARDED THE MERGER CLAUSE IN THE SETTLEMENT AGREEMENT AND RELATED LAW ....................................37

B.     THE ARBITRATOR DISREGARDED DR. HUNTER'S DISAVOWAL OF HIS VALUATION OF THE PAINTING AND BLACK-LETTER LAW THAT A PLAINTIFF BEARS THE BURDEN OF PROVING A SPECIFIC AMOUNT OF ALLEGED DAMAGES ...............................................42

C.     THE ARBITRATOR DISREGARDED THE PLAIN LANGUAGE OF THE SETTLEMENT AGREEMENT AND BLACK-LETTER LAW THAT BREACH OF CONTRACT DAMAGES CANNOT PUT THE PLAINTIFF IN A BETTER POSITION THAN IF THE CONTRACT HAD BEEN PERFORMED .................45

ii

III.   THE DISTRICT COURT ERRED IN FINDING THAT THE ARBITRATOR COMPLIED WITH §§ 10(**a**)(1) & (**a**)(3) OF THE FEDERAL ARBITRATION ACT ....................................................................................47

CONCLUSION ....................................................................................52

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Cases*

*Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*,
    727 F. Supp. 2d 256, 286–87 (S.D.N.Y. 2010) ....................................45

*AT&T Corp. v. Atos IT Sols. & Servs., Inc.*,
    714 F. Supp. 3d 310, 332 (S.D.N.Y. 2024) ........................................38

*Biotronik Mess-Und Therapiegeraete GmbH & Co. v.*
    *Medford Med. Instrument Co*.,
    415 F. Supp. 133, 138 (D.N.J. 1976) ...................................................48

*Copragri S.A. v. Agribusiness United DMCC*,
    No. 20 CIV. 5486 (LGS), 2021 WL 961751, at *5
    (S.D.N.Y. Mar. 15, 2021) ................................................................ 33,35

*Cottam v. 6D Glob. Techs., Inc.*,
    No. 21-1031-CV, 2022 WL 16908708, at *2 (2d Cir. Nov. 14, 2022) ...............43

*Exodus Partners, LLC v. Cooke*,
    No. 04 CIV. 10239 GEL, 2007 WL 120053, at *14
    (S.D.N.Y. Jan. 17, 2007) .....................................................................43

*France v. Bernstein*,
    43 F.4th 367, 378 (3d Cir. 2022) .........................................................47

*Halligan v. Piper Jaffray, Inc.*,
    148 F.3d 197, 204 (2d Cir. 1998) ........................................................35

*In re KG Winddown, LLC*,
    632 B.R. 448, 471–72 (Bankr. S.D.N.Y. 2021) ...................................38

*Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*,
    820 F.3d 527, 536 (2d Cir. 2016) ........................................................34

*Olin Holdings Ltd. v. State*,
    73 F.4th 92, 108 (2d Cir. 2023) ...........................................................34

*Oscar Gruss & Son, Inc. v. Hollander*,
    337 F.3d 186, 196 (2d Cir. 2003) ........................................................45

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
    497 F.3d 133, 143 (2d Cir. 2007) .............................................. *passim*

*Primex Int'l Corp. v. Wal-Mart Stores*,
    89 N.Y.2d 594, 657 N.Y.S.2d 385, 679 N.E.2d 624, 627 (1997) ......................39

*Sawtelle v. Waddell & Reed, Inc.*,
    304 A.D.2d 103, 108, 754 N.Y.S.2d 264, 269 (2003) ........................................35

*Schwartz v. Merrill Lynch & Co.*,
    665 F.3d 444, 452 (2d Cir. 2011) ........................................................35

*Seneca Nation of Indians v. New York*,
    988 F.3d 618, 625 (2d Cir. 2021) .......................................... 33, 34, 35

*Solomon Cap., LLC v. Lion Biotechnologies, Inc.*,
    171 A.D.3d 467, 468, 98 N.Y.S.3d 26, 28 (1st Dep't 2019)................................40

*Spear, Leeds & Kellogg v. Bullseye Sec., Inc.*,
    291 A.D.2d 255, 256, 738 N.Y.S.2d 27, 29 (2002) ............................................36

*Teamsters, Chauffeurs, Warehousemen & Helpers, Loc. Union No. 506*
    *v. E.D. Clapp Corp.*,
    551 F. Supp. 570, 578 (N.D.N.Y. 1982),  aff'd sub nom.
    *Teamsters, Chauffers v. Ed Clapp Corp.*,
    742 F.2d 1441 (2d Cir. 1983) ...................................................... 48, 50

*Tempo Shain Corp. v. Bertek, Inc.*,
    120 F.3d 16, 20 (2d Cir. 1997) ...................................................... 48, 50

*Torres v. D'Alesso*,
    80 A.D.3d 46, 53, 910 N.Y.S.2d 1, 7 (1st Dep't 2010).......................................39

*Trademark Rsch. Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326, 334 (2d Cir. 1993) ......................................................43

*Weiss v. Sallie Mae, Inc.*,
    939 F.3d 105, 109 (2d Cir. 2019) .............................................. *passim*

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
  126 F.3d 15, 25 (2d Cir. 1997) ............................................................36

**Statutes**

Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* ...................... 7, 33

9 U.S.C.A. § 10 .........................................................................................48

9 U.S.C. § 11(a) ........................................................................................36

28 U.S.C. § 636(b)(1)(C) ..........................................................................34

28 U.S.C. §1291 ..........................................................................................7

**Rules**

FED. R. CIV. P. 72(b)(3) ...........................................................................34

FED. R. APP. P. 4(A) ...................................................................................7

**Treatises**

§ 22:10. DATE OF THE BREACH, 28A N.Y. PRAC., CONTRACT LAW § 22:10 ............45

§ 22:12. AMOUNT OF DAMAGE, 28A N.Y. PRAC., CONTRACT LAW § 22:12 ............42

## INTRODUCTION

This appeal arises from a rogue arbitral award, dated April 5, 2023 (the "Award"), issued by an arbitrator who intentionally disregarded the clear terms of the parties' contract, sworn testimony, his own statements on the record and black-letter law to dispense his own brand of rough justice.[1] Instead of being scandalized by Respondents' fraudulent expert report on damages—which was unmasked as valuing an old masters painting at ***ten times*** the same expert's concealed prior valuation of the same painting just eighteen months earlier, and which the expert disavowed under oath at the hearing—the Arbitrator chose to disregard an actual free market public auction price of the painting and to rely upon the expert's disavowed, inflated valuation.

Under the terms of the parties' Settlement Agreement, ACG agreed to procure an old masters painting, Portrait of a Nobleman, by Andrea del Sarto (the "Painting"), and allocate the proceeds of sale according to a distribution waterfall. In old masters paintings, the physical condition of the painting is paramount to establishing its value. Prior to the Settlement Agreement, two renowned experts

---

[1] In the Award, the Arbitrator found that Appellants Ian Peck, ACG Arrangement Services, ACG Capital Company, LLC, Modern Art Services, LLC and Pegasus Credit Company LLC (collectively, "Appellants" or "ACG") breached the terms of a Settlement Agreement, dated January 20, 2021 (the "Settlement Agreement"), between ACG and Respondents Gary Greenberg, Loans On Fine Art LLC, Art Fund III LLC, Colorado Art Holdings LLC, GB Fund LLC and Lotus Investment Corp. (collectively, "Respondents" or "Greenberg"), and ultimately awarded Greenberg damages in the amount of $7,198,960.30, plus $1,017,124.34 in prejudgment interest, for a total of $8,216,084.64. (A77 & A90)

1

informed the parties that there were serious concerns about the Painting's condition and that it could be worth as little as under $1 million. However, with proper restoration and marketing, the parties believed the Painting could be worth much more.

The parties' deal foundered when the owner of the Painting failed to provide it to ACG, and ACG was unable to procure it for the agreed sale. Prior to the arbitration hearing on damages, on November 5, 2021, Greenberg's expert, Dr. Timothy Hunter, of Winston Art Group ("Winston"), provided an expert report (the "2021 Appraisal") in which he made an "extraordinary assumption" that the Painting was in excellent condition and valued it at $15 million. This assumption was improper because Greenberg knew there were serious concerns about the condition of the Painting. In addition, ACG learned—not through discovery, but by its own devices—that, less than eighteen months earlier, on October 4, 2019 (the "2019 Appraisal"), on grounds of its poor condition, Dr. Hunter had appraised the very same painting at only $1.5 million—just 10% of the value claimed by Greenberg in the arbitration. In violation of the Uniform Standards of Professional Appraisal Practice ("USPAP"), Dr. Hunter and Winston concealed this prior valuation in the 2021 Appraisal, rendering the 2021 Appraisal materially misleading. ACG demanded and eventually received a copy of the 2019 Appraisal,

but the Arbitrator denied repeated requests by ACG for discovery concerning the fraudulent concealment of the 2019 Appraisal.

On January 27, 2022, the Painting was sold on the open market at the prestigious annual Sotheby's old masters auction. However, due to its known poor condition and need of restoration, the Painting sold for a hammer price of just $1.8 million. This free-market price was in accord with Dr. Hunter's prior $1.5 million appraisal, and in stark contrast to Dr. Hunter's egregious $15 million valuation for purposes of litigation.

At the hearing, upon questioning by the Arbitrator himself, Dr. Hunter admitted that, by concealing the 2019 Appraisal, his 2021 Appraisal violated the USPAP Ethics Rule. Dr. Hunter further admitted that, in light of the 2019 Appraisal, the poor condition of the Painting would have "an impact on the price" and expressly disavowed his $15 million valuation, without providing a new, reduced damages number.

Dr. Hunter dubiously claimed that he simply forgot his prior appraisal and that its omission in the 2021 Appraisal was a mere accident. Although this story easily could have been tested with a brief adjournment and limited discovery from Winston, the Arbitrator accepted Dr. Hunter's explanation at face value and refused to allow ACG to adduce and present evidence concerning Winston's intake

process in 2021 and whether Dr. Hunter intentionally concealed the 2019 Appraisal and lied under oath.

At the conclusion of the hearing, off the record, reflecting some apparent bias or prejudice, the Arbitrator told the parties that he believed that Greenberg had been induced to enter into the Settlement Agreement based on the expectation of a much higher valuation of the Painting, and the prospect of awarding damages based upon the $1.8 million free market sale price of the Painting—the only actual market valuation of the Painting—"left him cold."

Thereafter, in his Decision on Damages and Final Award, the Arbitrator stunningly chose to credit the $15 million valuation of the Painting that Dr. Hunter had disavowed under oath, upon the Arbitrator's own questioning. To achieve this result, the Arbitrator (1) simply rewrote the Settlement Agreement, contending that, in it, ACG had represented that the Painting was in good condition, when it expressly did not; and (2) relied upon alleged statements concerning the condition and value of the Painting, obtained from the owner and shared with Greenberg prior to the Settlement Agreement, which were expressly precluded under the merger clause in § 16 of the agreement. Sticking his head in the sand, the Arbitrator minimized the impropriety of the inflated 2021 Appraisal, which plainly was intended to mislead and defraud.

As set forth below, although the standard for vacating an arbitration award is high, upon the unusual and egregious facts of this case, the District Judge should have vacated the Award on grounds that the Arbitrator manifestly disregarded the express terms of the parties' contract and the law, and its failure to do so was clearly erroneous. First, without any colorable grounds to do so, the Arbitrator disregarded the merger clause in the Settlement Agreement and held ACG to purportedly "binding" prior representations concerning the condition and value of the Painting. Had the Arbitrator duly enforced, rather than disregarded, the merger clause, he would have had to find that Dr. Hunter was not entitled to assume that the Painting was in excellent condition, and thus that the 2019 Appraisal was relevant to—if not determinate of—the Painting's value.

Second, the Arbitrator disregarded Dr. Hunter's factual admission that, in light of the 2019 Appraisal, there would be "an impact on the price," and he would have to "temper" his valuation of the Painting. In the absence of Dr. Hunter's disavowed $15 million valuation, there was no evidence offered by Greenberg to support any specific quantum of alleged damages—impermissibly leaving the Arbitrator to engage in pure guesswork and speculation. Under these circumstances, the only competent bases for valuing the Painting were the 2019 Appraisal of $1.5 million and the free-market sale price of $1.8 million. The Arbitrator should have based his award, if any, upon those valuations.

5

Third, for no logical reason, the Arbitrator refused to deduct 10% of the hypothetical sale price of the Painting, which under the clear terms of the distribution waterfall in § 1(c) of the contract would be paid to ACG as "Sales Expenses," and thus put Greenberg in a better position than if the contract had been performed.

The District Court also should have vacated the Award on grounds that the Arbitrator violated §§ 10(a)(1) & (a)(3) of the Federal Arbitration Act, 9 U.S.C., *et seq.*, by allowing Greenberg to procure the Award through "corruption, fraud or undue means" and by "refusing to hear evidence pertinent and material to the controversy." The District Court should have found that Dr. Hunter's admitted concealment of the 2019 Appraisal in his expert report was an apparent fraud and allowed ACG to establish that Dr. Hunter's testimony under oath at the hearing likewise was false. Contrary to the Arbitrator's decision, cross examination of Dr. Hunter concerning the 2019 Appraisal was insufficient could not provide "the same information" as documents found in the files of Winston or the testimony of Dr. Hunter's colleagues. Such additional evidence was not cumulative, but (1) essential to the credibility of Dr. Hunter as a witness; and (2) needed to establish that Dr. Hunter in fact believed the Painting was worth no more than $1.5 million. In refusing to hear such evidence, the Arbitrator violated § 10(a)(3) of the Federal Arbitration Act.

Accordingly, the Court should reverse the Opinion & Order of the District Court, dated October 29, 2024, and vacate the Final Award of the Arbitrator.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction to confirm the Award under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*. On November 27, 2024, Appellants timely appealed from the District Court's Opinion and Order and Judgement, each dated October 29, 2024. *See* FED. R. APP. P. 4(a). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the Arbitrator manifestly disregarded the plain language of the parties' Settlement Agreement and the law by disregarding the merger clause and considering alleged prior representations concerning the Painting.

2.      Whether the Arbitrator manifestly disregarded the evidence and the law by ignoring Dr. Hunter's disavowal of his valuation of the Painting without providing any other valuation of the Painting on the alleged date of the breach

3.      Whether the Arbitrator manifestly disregarded the law by disregarding the plain language of the distribution waterfall in § 1(c) of the Settlement Agreement, which required that the first 10% of any sales proceeds be allocated to ACG.

4.      Whether the Award should have been vacated under §§ 10(a)(1) of the

Federal Arbitration Act because on grounds of "corruption, fraud or undue means" by Greenberg, including submitting the fraudulent 2021 Appraisal.

5.      Whether the Award should have been vacated under §§ 10(a)(3) of the Federal Arbitration Act on grounds the Arbitrator was "guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced."

## STATEMENT OF THE CASE

On May 18, 2023, Greenberg filed a motion to confirm the Award in the United States District Court for the Southern District of New York, Civil Action No. 1:23-cv-4143. On July 5, 2023, ACG filed a motion to vacate the Award, Civil Action No. 1:23-cv-5717. By order, dated November 16, 2023, the District Court consolidated the two actions under the docket number Civil Action No. 1:23-cv-4143. On February 5, 2024, Magistrate Jennifer E. Willis issued a Report and Recommendation (the "R&R"), which erroneously recommended that the Award be confirmed. Upon ACG's objections, in a one-page rubber-stamp Order, dated March 31, 2024, the District Court adopted the R&R in its entirety. Thereafter, in an Opinion and Order, dated October 29, 2024, the District Court expanded slightly upon the grounds for confirming the Award and issued a Judgment, dated October 29, 2024, in the amount of $8,216,084.64. Finally, upon Greenberg's

application, the District Court issued an Amended Judgment, dated November 19, 2024, in the same amount.

## STATEMENT OF FACTS

ACG is in the business of making loans secured by fine art and other art-related business transactions. In or about 2014, ACG was introduced to Gary Greenberg, the principal of Respondents, which entered into one or more loan participation agreements and other transactions with ACG.

### A. Greenberg Dupes ACG Into Making a Bad Loan

In February 2015, Greenberg duped ACG into making a $1 million dollar art loan to a business partner of his named Dominique Pinault, who Greenberg represented was a relative of the French billionaire, Francois Pinault. (A105-06 & 131) The purpose of the loan was to enable Pinault to pay an amount he owed to Greenberg. (*See id.*) Among the due diligence materials Greenberg provided to ACG was a screenshot of an alleged Pinault bank account reflecting a current balance of $1,055,000. (*See id.*) Pinault immediately defaulted on the loan. Subsequent investigation by ACG established that the screenshot provided by Greenberg was a complete fabrication. (*See id.*) In response, ACG stopped making payments to Greenberg under the parties' agreements. (*See id.*)

### B. The Parties Discuss Settlement

In 2019, Greenberg and ACG began to discuss a resolution of their dispute over the Pinault matter and disputes over a number of loan participation

9

agreements. (A131 ¶ 7) Between October 2019 and January 2021, an agreement took shape, ultimately in the form of the Settlement Agreement at issue in this case, in which ACG agreed to provide Greenberg a profit share in the sale of an Italian renaissance painting which ACG had identified, Portrait of a Nobleman, by Andrea Del Sarto. (A50) The Painting then was held by an eccentric art historian named Virginia Bonito, who was seeking to authenticate it as an undiscovered masterpiece featuring a portrait of the Florentine banker, Ottaviano de Medici. (A201-02 at 16-18)

### C. The Parties Jointly Retain Robert Simon to Evaluate the Painting

In connection with the parties' discussions, ACG and Greenberg jointly retained Robert A. Simon Fine Art to evaluate the Painting, including its authenticity and physical condition. (A245-46 at 193-94; A171 at 15-16) Bonito provided Messrs. Peck and Simon materials about the Painting, which they shared with Greenberg, making clear that the source of such materials was the owner. (A174-75 at 29-31; A186-87 at 75-78)

After personally inspecting the Painting, which Bonito kept in her home, Mr. Simon concerns about its condition and provenance. (A172 at 18-19; A768-69 at 1-2) Mr. Simon also found dubious certain representations by Bonito about the Painting's conservation history, which raised "a red flag" for him. (A171 at 18-20) Mr. Simon thus engaged a respected art conservator, Diane Modestini, to join him

to inspect the work a second time. (A171-72 at 19-21; A768-69 at 1-2) Ms. Modestini shared Mr. Simon's concerns and recommended that the Painting be inspected properly under laboratory conditions. (A171 at 20-21; A768-69 at 1-2)

It is undisputed that Mr. Simon communicated to Greenberg his concerns about the condition and conservation history of the Painting—including that that the Painting could be worth as little as a million dollars. (A173 at 24; A768-69 at 2) During the hearing, Greenberg admitted as follows:

> 14· · · ·Q· And in fact, Dr. Simon told you that the
> 15· ·condition of the painting was in question,
> 16· ·correct?
> 17· · · ·A· *He had questions about the condition,*
> 18· *·that's why we brought [Modestini] in.*
> 19· · · ·Q· Okay.· And do you recall Dr. Simon was not
> 20· ·satisfied with representations that the owner had
> 21· ·made concerning the restoration of the work?
> 22· · · ·A· *He had questions, that's why he wanted*
> 23· *·Diane Modestini involved.*

(A246 at 196-97) (emphasis added). Indeed, during the hearing, Greenberg admitted that Mr. Simon was unwilling to issue an appraisal of the Painting until Ms. Modestini had been allowed to examine it in her laboratory and to issue a report. (A246 at 197)

Despite these and other "red flags," Greenberg remained interested in the Painting. "Frustrated" with Mr. Simon's careful and responsible process, Greenberg came up with an impetuous solution. (A246-47 at 197-98) He would proceed immediately with a settlement agreement with ACG—under which the

11

Painting would be consigned for auction by Christies—and only later decide whether to participate in the art sale, after Christies had evaluated the Painting. (A246-47 at 197-200)

### D. ACG Enters into an Agreement to Purchase the Painting from Bonito

Pursuant to the discussions with Greenberg, an affiliate of ACG began negotiating to purchase the Painting from Bonito. (A261-62 ¶ 2) In or about December 2020, Bonito agreed to sell the Painting to ACG's affiliate, promising to deliver it at Mana Fine Art ("Mana"), in New Jersey. However, Bonito concealed from ACG that, in a confidential arbitration proceeding, a creditor had obtained a restraining order preventing her from moving the Painting without its consent. (A265 ¶¶ 14-15)

### E. The Settlement Agreement

Although dated as of January 20, 2021, the parties executed the Settlement Agreement on January 30, 2021. (A50) In § 6(e) of the Settlement Agreement, ACG represented that it understood the Painting to be "an authentic work of art by Andrea Del Sarto, as described above in Section 1(a)." (A54) Other than this, ACG made no representation of any kind concerning the Painting itself, including concerning its condition. Reliance by Greenberg upon any purported prior representation was precluded by § 16 of the Settlement Agreement, a standard

12

merger clause.[2] (A57) Indeed, at the arbitration hearing, upon the arbitrator's own questioning, Greenberg admitted that he understood that the integration clause would bar him from relying upon such alleged prior representations. Greenberg testified:

> Q· Do you understand this to be what's called
> 22· ·an integration clause?
> 23· · · ·A· What do you call it?
> 24· · · ·Q· Withdrawn.
> 25· · · · · You understood then that anything that was
> Page 210
> ·1· ·not actually represented in the body of this
> ·2· ·agreement, you were -- were superseded by the
> ·3· ·contents of this agreement; did you understand
> ·4· ·that?
> ·5· · · · · MR. NIKAS:· Objection.
> ·6· · · · · MR. PRESS:· You can answer.
> ·7· · · · ARBITRATOR KRAMER:· He can answer if he
> ·8· ·understands it.· **The question was if Mr. Peck had**
> **·9· ·made a lot of representations that didn't find**
> **10· their way into this agreement, you understand that**
> **11· ·paragraph 16 would bar you from relying on those?**
> **12· · · · · THE WITNESS:· Yes.**

(A249-50 at 209-10) (emphasis added).

Section 1(a) of the Settlement Agreement establishes three specific deadlines for performance by ACG: (1) an evaluation of the Painting by Christie's or a comparable firm (the "Auctioneer"), on or before February 12, 2021; (2) a consignment agreement with the Auctioneer on or before February 19, 2021; and

---

[2] Section 16 provides in full: "Entire Agreement. This Agreement constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersedes all prior agreements and understandings, both written and oral, of the Parties regarding the subject matter hereof and thereof." (A57)

(3) the Painting be delivered to the Auctioneer and auctioned or sold by private sale on or before May 31, 2021. (A50-51)[3]

Section 1(a)(ii) of the Settlement Agreement provides that "GB has the right to terminate this Agreement, in its sole discretion, if the Auctioneer provides a low-end estimate for the Work that is less than $4 million, unless the Auctioneer obtains a minimum guarantee for the work equal to or greater than $4 million." (A51) Prior to the Settlement Agreement, Josh Glazer, the head of the Christies old masters group, told Greenberg that "condition was a very important factor in valuing that painting." (A247 at 199) Greenberg included this provision so that he would have an option not to proceed with the Settlement Agreement if, due to its condition, the Painting turned out to be less valuable than he hoped.

Upon a sale of the Painting, the distribution waterfall in § 1(c) of the Settlement Agreement provides that the proceeds shall be allocated as follows:

> a. First, *at any price level*, each and every dollar collected from the Sales Price shall be applied to pay sales expenses ("Sales Expenses"), *calculated at ten percent of gross Sales Price, which shall be payable to ACG;*
>
> b. Second, after Sales Expenses, first $4.150 million of sales proceeds is *payable to GB*, paid directly by the Auctioneer;

---

[3] Section 1(a) also provides that "the evaluation, consignment and auction dates are subject to scheduling changes by the Auctioneer and advice regarding the sale date from the Auctioneer, or front Robert Simon or another comparable expert." (A50-51)

    c.  Third, sales proceeds up to $6 million (plus Sales Expenses) shall be ***paid to ACG***;

    d.  Fourth, any amount in excess of $6 million plus Sales Expenses ($6.6 million), **GB shall receive** the following amounts, as set forth in the accompanying spreadsheet in Exhibit B, **with the remainder to ACG**:

        i.  $6.0 million plus Sales Expenses to $9.99 million plus Sales Expenses: $150,000 + 30% of net profits, after deduction of 25% owed to third party.

        ii.  $10 million plus Sales Expenses to $14.99 million plus Sales Expenses: 22% of net profits, after deduction of 25% owed to third party.

        iii.  $15 million plus Sales Expenses to $19.99 million plus Sales Expenses: 11% of net profits, after deduction of 25% owed to third party.

        iv.  $20 million plus Sales Expenses to $29.99 million plus Sales Expenses: 5% of net profits, after deduction of 25% owed to third party.

        v.  $30 million plus Sales Expenses and up: No additional payment beyond above profit sharing.

(A51-52 § 1(c)) (emphasis added).

### F. Due to Bonito's Duplicity, ACG is Unable to Meet the Original Evaluation, Consignment and Auction Deadlines

After execution of the Settlement Agreement, ACG sought to obtain the Painting from Bonito and to timely provide it to the Auctioneer for evaluation. (A265-66 ¶¶ 14-16) However, unknown to ACG, under the protective order in the arbitration brought by her creditor, Bonito was enjoined from delivering the

15

Painting. (*See id.*) Thus, ACG found it was unable to provide the Painting to the Auctioneer by the tight two-week deadline of February 12, 2021, and unable to enter into a consignment agreement with the Auctioneer a week later, by February 19, 2021. However, ACG still had time to obtain the Painting from Bonito before the Christie's Old Masters Auction favored by Greenberg and was attempting to do so.

### G. Greenberg Commences the Arbitration with JAMS

On April 29, 2021, over a month before the May 31, 2021 payment deadline in § 1(a) of the Settlement Agreement, Greenberg commenced the Arbitration with JAMS in New York. (A26-27) On May 27, 2021, upon Greenberg's motion, an Emergency Arbitrator granted a preliminary injunction prohibiting ACG from moving, selling, relocating, assigning or pledging the Painting. (A688) This blocked ACG's continuing efforts to complete the acquisition of the Painting from Bonito and to perform its remaining obligations under the Settlement Agreement.

### H. The Arbitrator Awards Summary Disposition on Liability and Sets a Hearing on Damages

Upon a motion for summary disposition under JAMS Rule 18, the Arbitrator rejected ACG's argument that it was excused from timely delivering the Painting to the Auctioneer because Bonito concealed the restraining order that prohibited her from delivering the Painting, which rendered delivery impossible. (A70-71) The Arbitrator also dismissed ACG's counterclaims, including that Greenberg

16

fraudulently induced it to make the bad $1 million loan to Pinault, the proceeds of which were paid to Greenberg. (A72-73) The Arbitrator then set a hearing solely on Greenberg's alleged damages under the contract.

**I. Dr. Hunter's Prior 2019 Appraisal of the Painting**

In October 2019, Dr. Hunter's colleague at Winston, Geza von Habsburg, conducted an appraisal of the Painting (the "2019 Appraisal") for another potential investor. (A375) In connection with the 2019 Appraisal, von Habsburg (1) reviewed the same collection of materials regarding provenance, authenticity and condition that Bonito provided to Messrs. Simon and Peck; and (2) conducted a physical examination of the Painting. (A3383 2019, Appraisal at 9) Among other things, in his report, von Habsburg found that the Painting was not in good physical condition—a critical factor in the value of old masters paintings—and thus valued the Painting at $1.5 million. *See id.* He stated:

> [E]ven if documented as fully autograph by noted scholars of the subject, a Fair Market Value in the range of $2-3 million for this work would be appropriate. The fact that much work still needs to be done would mean that the present Fair Market Value is somewhat less than this range. ***Therefore, the appraiser has assigned a Fair Market Value, with current scholarship, of $1.5 million***.

(A3383 2019, Appraisal at 9) (emphasis added).

Significantly, in addition to von Habsburg, the 2019 Appraisal discloses that Dr. Hunter was a material contributor to the valuation. The 2019 Appraisal states

that "the Old Masters specialist, Tim Hunter, provided significant personal property appraisal assistance *by assisting with the research and valuation for the property* that is subject in this report." 2019 Appraisal at 4 (emphasis added). Thus, in October 2019, Dr. Hunter was aware that the Painting was not in good physical condition and was worth no more than $1.5 million.

### J. Greenberg Submits Dr. Hunter's Fraudulent 2021 Appraisal

Prior to the hearing on damages, the parties exchanged expert reports on the value of the Painting. Greenberg submitted an expert report, dated November 5, 2021, authored by Dr. Hunter and Elizabeth von Habsburg, the wife of Geza and the Managing Director of Winston (the "2021 Appraisal"). (A305)

Having participated in Geza's prior 2019 Appraisal, Dr. Hunter, knew that that the Painting was not in good condition and was worth no more than $1.5 million. Nevertheless, in the 2021 Appraisal, Dr. Hunter purported to find that the Painting—which had not changed during the intervening eighteen months—was worth *$15 million*—ten times more than the 2019 Appraisal. (A315)[4] To achieve this alchemy, in the 2021 Appraisal, Dr. Hunter made a number of materially false

---

[4] Greenberg and Dr. Hunter apparently chose this number based on a statement by Ian Peck that he believed the Painting could be worth between $10 and $15 million "if its properly handled." (A658 at 73) But proper handling would include a multi-year plan for reconditioning the Painting, additional scholarship and a well-planned and patient marketing strategy, not simply dumping the Painting in its current state in the next old master's art auction. (A256 at 236)

"extraordinary assumptions," including that the Painting was in excellent condition, when he knew that it was not. (A310-11)

Under the Uniform Standards of Professional Appraisal Practice, an "extraordinary assumption" is a "assignment-specific assumption as of the effective date regarding ***uncertain information*** used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." (Emphasis added). (A276) Thus, under USPAP rules, (1) an appraiser can't make an extraordinary assumption of a fact already known to be false; and (2) by definition, an extraordinary assumption is material to the appraiser's opinions or conclusions. Thus, by definition, a false extraordinary assumption is materially misleading.

The USPAP Ethics Rule provides that "[a]n appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests." (A279) Among other things, an appraiser must not (1) communicate assignment results with the intent to mislead or to defraud; (2) use or communicate a report or assignment results known by the appraiser to be misleading or fraudulent; or (3) knowingly permit an employee or other person to communicate a report or assignment results that are misleading or fraudulent. (A279) The USPAP Ethics Rule continues:

> If known prior to agreeing to perform an assignment, and/or if discovered at any time during the assignment, ***an appraiser must disclose to the client, and in each subsequent report certification***:

19

. . .

> • *any services regarding the subject property performed by the appraiser, as an appraiser or in any other capacity, within the three-year period immediately preceding the agreement to perform the assignment*.
>
> <u>Comment</u>: Disclosing the fact that the appraiser has previously appraised the property is permitted except in the case when an appraiser has agreed with the client to keep the mere occurrence of a prior assignment confidential. *If an appraiser has agreed with a client not to disclose that he or she has appraised a property, the appraiser must decline all subsequent agreements to perform assignments that fall within the three-year period.*

(A279) (emphasis added). Thus, under the USPAP Ethics Rule, an appraiser must abstain from advocacy or fraud and has an affirmative duty to disclose any prior appraisal of the same work within the past three years, or else decline to issue an appraisal. (*See id.*)

In the 2021 Appraisal, Dr. Hunter certified that "the appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the 2020-2021 Uniform Standards of Professional Appraisal Practice." (A307 2021) Dr. Hunter also certified that "the appraiser has not performed services as an appraiser or in any other capacity for the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment." (A307 2021)

However, as Dr. Hunter admitted at the arbitration hearing, this certification was false. (A221 at 95). Just eighteen months earlier, he and Winston previously

20

had appraised the Painting at a vastly lower valuation and his failure to disclose the prior 2019 valuation—as well as Winston's specific finding that the Painting was in poor condition—plainly was done with intent to mislead and defraud ACG and the Arbitrator.

### K. ACG Learns of Dr. Hunter's Prior 2019 Appraisal of the Painting

After Dr. Hunter provided his 2021 Appraisal, ACG fortuitously learned of the 2019 Appraisal through contacts in the art industry and demanded a copy from Greenberg. (A112) Greenberg initially refused to produce the 2019 Appraisal, claiming that it was not relevant because Dr. Hunter had not relied upon it in his 2021 Appraisal. However, the Arbitrator ultimately ordered Greenberg to produce the document.

### L. Dr. Hunter's Specious Claims About the 2019 Appraisal

In the arbitration hearing, Dr. Hunter claimed he did not fail to disclose the 2019 Appraisal in order to conceal its vastly lower valuation of the Painting, but instead simply "forgot" about his prior valuation of this significant renaissance painting. (A210-11) Dr. Hunter also claimed his contribution to the 2019 Appraisal consisted of answering a single phone call from von Habsburg and advising that he had prior experience with Bonito and knew that she was a joint owner of the Painting, which would create a "nightmare" in due diligence. (A211 at 55-56) But this admittedly "material" insight—which would have an obvious impact on

value—appears neither in the 2019 Appraisal nor in the 2021 Appraisal. (A305 & A375) Nor does it fit von Habsburg's description of Dr. Hunter's work on the 2019 Appraisal—which consisted of "research" and valuation." (A 378)

Dr. Hunter's story of limited involvement thus appears to be a sham. Even if Dr. Hunter initially forgot his prior involvement with an old master's painting by an important artist, the prior engagement necessarily would have come up in Winston's intake process. Dr. Hunter admitted that he received the assignment directly from Elizabeth von Habsburg, his co-author of the 2021 Appraisal, and wife of Geza. (A222 at 100 & A235 at 151) Nevertheless, the Arbitrator refused to strike Dr. Hunter's expert report or testimony.

### M. The Arbitrator Refuses to Hear Evidence on the Concealment of Winston Art Group's Prior Valuation of the Painting

After learning of the 2019 Appraisal, ACG issued a subpoena to Winston, seeking evidence on the knowledge and intent of Dr. Hunter, Winston and Greenberg in failing to disclose the 2019 Appraisal and in concocting the fraudulent 2021 Appraisal. (A426) However, the Arbitrator closed his ears to such evidence, spuriously insisting there was not even the appearance of misconduct by Dr. Hunter or Greenberg. (A82 at 6-7 & n.4)

### N. The Painting is Sold in a Sotheby's Auction for $1.8 Million

On January 27, 2022, the Painting was sold in an old masters auction conducted by Sotheby's, the preeminent old masters auction in the industry. (A189

at 86-87) Prior to the auction, Sotheby's obtained an irrevocable bid on the Painting in the amount of $1.8 million. At the auction itself, there were no other bids on the Painting and it was sold to the irrevocable bidder for a hammer price of $1.8 million. (A251 at 215-16; A180 at 52; A217 at 79).[5] This sale price was in accord with Winston's 2019 Appraisal of the Painting at $1.5 million.

### O. The Arbitrator Refuses to Hear Evidence on the Concealment of the Prior Winston Art Valuation

Both at the commencement and conclusion of the hearing, ACG requested an adjournment to obtain critical evidence—including the USPAP-mandated workfiles of the two appraisals—and testimony of Geza and Elizabeth von Habsburg, to establish Winston's intentional violations of USPAP rules. (A199 at 6-8; A193-95 at 103-112) Such evidence would establish grounds for the Arbitrator, not only to strike Dr. Hunter's expert testimony, but to dismiss Greenberg's claims and award sanctions to ACG. But the Arbitrator refused to entertain such evidence. (A82 at 6-7 & n.4)

### P. Dr. Hunter Admits he Overvalued the Painting but Provides no New Valuation

At the hearing, upon the Arbitrator's own questioning, Dr. Hunter admitted that, taking into account the 2019 Appraisal would "have an impact on price," and

---

[5] The public record of the auction, published by Sotheby's on its website, reflects a total price including the hammer price, buyer's premium and costs and expenses of $ 2,198,000. (A433)

that he would have to substantially reduce the valuation in his 2021 Appraisal. He

stated:

> · · ARBITRATOR KRAMER:· I have a question.
> ·7· · · · · *Now, that you've the 2019 appraisal by a*
> ·8· *·colleague that you respect, Mr. Von Habsburg, and*
> ·9· *·it appears, to me anyway, that some of your*
> 10· *·extraordinary assumptions in your 2021 appraisal*
> 11· *·are not justified.* You were asked if they were in
> 12· ·good condition, would you today having seen the
> 13· ·2019 appraisal and the condition report, *would*
> 14· *·that cause you to change your appraisal?*
> 15· · · · · **THE WITNESS:·** *Well, the things that have*
> 16· *·changed, clearly the title issue, the ownership*
> 17· *·issue is a problem, and condition seems to be more*
> 18· *·complicated than I was assuming, I was asked to*
> 19· *·assume.· So those two factors, yes, they would*
> 20· *·have an impact on the price.· I think I would,*
> 21· *·therefore, have -- well, not certainly be as low*
> 22· *·as $1.5 million, but I would have tempered the*
> 23· *·valuations, yes.*

(A235 at 152) (emphasis added).

Despite abandoning the 2021 Appraisal's $15 million valuation, Dr. Hunter

did not offer a new "tempered" valuation of the Painting. (A235 at 152) Thus,

there was a failure of proof by Greenberg that left the arbitrator without any

reliable basis for establishing damages.

### Q. The Arbitrator States that Awarding Damages Based on the Market Price of the Painting at the Sotheby's Auction "Leaves Me Cold"

At the conclusion of the hearing, off the record, the Arbitrator announced to

the parties that, although he understood the Painting had sold in a public auction

for a price of $1.8 million, awarding damages to Greenberg based on that valuation of the Painting "leaves me cold." (A127 ¶ 2) The Arbitrator said he thought that, at the time of the Settlement Agreement, Greenberg believed the Painting was worth far more than this, based on prior representations by ACG—alleged representations which were barred by the merger clause in § 16 of the Settlement Agreement. (*See id.*) The Arbitrator said that he planned to issue an award in accord with those expectations. (*See id.*)

### R. The Arbitrator Intentionally Disregards Black-letter Law on the Effect of an Integration Clause in a Contract to Credit Alleged Prior Representations on the Condition of the Painting

In his Decision, dated February 20, 2023, the Arbitrator found that ACG represented that the Painting was in "good condition," which representation was "binding." (A79) However, the provision of the Settlement Agreement the Arbitrator cited, § 6(e), states only that the Painting "is an authentic work of art by Art by Andrea Del Sarto" and makes no representation about its condition. (A54) To find that ACG made representations about the condition of the Painting, the Arbitrator looked instead to documents prepared by or on behalf of the owner, Bonito, and shared with Greenberg, (A80), which Greenberg admitted did not dispel the concerns of Mr. Simon and Ms. Modestini about the condition of the Painting. (A246 at 196-97) In any case, as Greenberg admitted at the hearing, upon questioning by the Arbitrator himself, reliance upon such alleged precontractual

representations was precluded under the merger clause in § 16 of the Settlement Agreement.[6]

Although the Arbitrator stated during the hearing that a number of Dr. Hunter's extraordinary assumptions—including concerning the condition of the Painting—appeared "unjustified" in light of the 2019 Appraisal, in his Decision, the Arbitrator reversed himself and found that none of this mattered. Even though he conceded that the 2019 Appraisal found the Painting was in poor condition, the Arbitrator nevertheless found that "[t]he 2019 Appraisal's conclusions are not pertinent to reaching a determination of the value for assessing breach of the Settlement Agreement," and that Dr. Hunter was entitled to assume that the Painting was in excellent condition because "[i]t would be totally unfair to find that the painting was not in good condition when [ACG] *represented that it was*. . . ." (A83-84) (emphasis added). Thus, the Arbitrator found that, even though the Painting in fact was not in good condition, it would be appropriate to award damages as though the Painting was in excellent condition because ACG purportedly made binding precontractual representations that the Painting was in good condition.[7]

---

[6] The Arbitrator also improperly relied upon other parol evidence, including a mischaracterization of Mr. Peck's testimony during the preliminary injunction hearing that the Painting could be worth $10-15 million "if its properly handled," which included addressing the Painting's condition. (A659 at 73)

[7] The Arbitrator ignored the fact that, under §§ 1(a)(ii) & 6 of the Settlement Agreement,
(continued...)

Although the Arbitrator correctly found that Dr. Hunter and Winston violated USPAP rules by failing to disclose the 2019 Appraisal, the Arbitrator mistakenly found that Greenberg's concealment of the 2019 Appraisal was not an attempt to defraud ACG and the Arbitrator. (A82) Ignoring the fact that Greenberg did not voluntarily disclose the existence of the 2019 Appraisal—and that ACG only fortuitously learned of it by its own devices—the Arbitrator stated that ACG's "assertion that the 2019 Appraisal was hidden as part of a fraud makes no sense." (A82) But the fact that, through sheer luck, Greenberg's fraudulent scheme happened to be foiled does not mean that there was no fraud. And the Arbitrator stubbornly refused to consider the possibility that Dr. Hunter's cover story of forgetting about the 2019 Appraisal was a further fraud upon ACG and the Arbitrator. (A82-83) (stating, despite Dr. Hunter's admitted violation of USPAP rules, that "[i]t is inconceivable that he would lie under oath to be complicit in a fraud upon an arbitration tribunal").

Turning to the valuation of the Painting itself, although at the hearing Dr. Hunter clearly abandoned his $15 million valuation of the Painting, the Arbitrator nevertheless found that this disavowed figure "appears to be the most accurate estimate of value." (A85) Ignoring the sworn testimony, the Arbitrator found that

---

Greenberg was entitled to cancel the agreement if the Painting was worth less than $4 million, or if ACG breached any representation, but instead chose to proceed with a risky arbitration that made false assumptions concerning the value of the Painting.

Dr. Hunter's admission—upon the Arbitrator's own questioning—that he would "temper" his excessive valuation of the Painting, somehow was not clear. (A82 n.7) In fact, Dr. Hunter stated unequivocally under oath that the admitted poor condition of the Painting would "have an impact on the price," which he did not specify except to say that it would not reduce the value to as low as $1.5 million. Thus, Dr. Hunter abandoned his $15 million valuation without providing a new one.[8]

The Arbitrator also wrongly distinguished the $1.5 million valuation of the Painting in the 2019 Appraisal and $1.8 million free market sale of the Painting by Sotheby's,[9] which were in accord and together are the best indication of value. The only basis for disregarding the $1.8 million public sale price was testimony by Dr. Hunter—unsupported by any underlying evidence—which was beyond the scope of his expert report.

Finally, although the Arbitrator correctly found that breach of contract damages are intended to put the plaintiff in the same position as if the contract had been performed, (A79), he erroneously failed to deduct the first 10% of the

---

[8] (A235 at 152) ("So those two factors, yes, they would have an impact on the price. I think I would, therefore, have -- well, not certainly be as low as $1.5 million, but I would have tempered the valuations, yes.").

[9] The Arbitrator found the sale price was impacted by a lawsuit filed only days before the auction, although there was no evidence that any bidder was aware of the lawsuit and the undisputed evidence was that Sotheby's guarantees title to its purchasers.(A84)

hypothetical sales price of the Painting, as required by § 1(c) of the Settlement Agreement. (A86) (stating "[i]n implementing the formula, I find that no deduction should be made for 'sales expenses.'"). As Greenberg admitted under oath during the hearing, to put the parties in the same position as if the contract had been performed, "at any price level" there would have to be a deduction for "sales expenses" payable to ACG, which the parties stipulated to be "ten percent of [the] gross Sales Price." (A61 § 1(c)(i); A248 at 202-203) ("Q: ***And that came off the top no matter what level the sales price went to***; fair to say? A: ***Yes***."). In ignoring the clear terms of the parties' agreement, the Arbitrator offered no justification.

Initially, the Arbitrator computed that, without the 10% deduction, Greenberg was entitled to an award of $5,273,150. (A86) However, in his subsequent Final Award—again failing to deduct the first 10%—the Arbitrator erroneously recomputed the award to be $6,021,100—an increase of nearly $1 million. (A91-2 Final Award at 2-3) The Arbitrator's new computation ignored the terms of § 1(c) of the Settlement Agreement and makes no sense.

### S. The Magistrate's Erroneous Report and Recommendation

In the R&R, the Magistrate recognized the grounds for *vacatur* of an arbitration award under the FAA, and for manifest disregard of the law, but found that none applied and recommended confirmation of the Award. (A910-21)

First, the Magistrate recommended not to vacate the Award under § 10(a)(3)

of the FAA, on grounds that the Arbitrator was "guilty of misconduct in refusing to postpone the hearing . . . or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C.A. § 10(a)(3). The Magistrate erroneously found that cross-examination of Dr. Hunter alone, without disclosure of any underlying evidence, was sufficient to explore the circumstances of Winston's concealment of the 2019 Appraisal—which was a clear and admitted violation of the USPAP Ethics Rule—and to establish that it was done with an intent to defraud. (A913-14) The Magistrate found that email and evidence from other witnesses, including Dr. Hunter's supervisor, Ms. von Habsburg, concerning the intake and conflict process, would be "cumulative" and "duplicative" of Dr. Hunter's testimony. (A914) The Magistrate thus found that the Arbitrator was within his discretion in denying ACG the opportunity to develop and present new and different evidence concerning Winston's intake process to contradict Dr. Hunter's testimony that the concealment was a mere accident. (A913-14) Like the Arbitrator, the Magistrate relied on the circular reasoning that, despite the highly suspicious circumstances—including an admitted violation of the USPAP Ethical Rule—because Dr. Hunter appeared credible, there was no need to further examine his credibility. (A915)

Second, the Magistrate recommended not to vacate the Award under § 10(a)(1) of the FAA, on ground that it was procured by "corruption, fraud or undue

means." 9 U.S.C.A. § 10(a)(1). (A915) The Magistrate erroneously found that ACG's argument that, in concealing the 2019 Appraisal, Greenberg tried to defraud ACG and the Arbitrator "makes no sense." (A915) Like the Arbitrator, the Magistrate found that because ACG had partially foiled the fraud—by *independently* discovering the 2019 Appraisal—there was nothing to be concerned about. (A915) The Magistrate blithely dismissed the possibility that Dr. Hunter lied about forgetting the 2019 Appraisal, and the significance of this fact both for his credibility as a witness and Greenberg's unclean hands in egregiously inflating its valuation of the Painting. (A915)

Third, the Magistrate recommended finding that the Arbitrator did not manifestly disregard the law. First, although the law on merger clauses is longstanding and clear—and admitted by both Greenberg and the Arbitrator on the record during the hearing (A249-50 at 209-10)—the Magistrate found that Dr. Hunter was entitled to rely upon alleged prior representations by ACG that the Painting was in excellent condition. (A917-18) The Magistrate also states that Dr. Hunter was entitled to rely upon representations concerning the Painting's condition in the Settlement Agreement itself. (A917) However, the only representation in the Settlement Agreement concerning the Painting was as to authenticity, not condition, and any other representation was expressly disclaimed. (A53-54 & 57) Second, the Magistrate found it was appropriate for the Arbitrator to "credit" the $15 million

31

valuation which Dr. Hunter expressly disclaimed during the hearing, upon the Arbitrator's own questioning. (A919) Third, the Magistrate found that there was a colorable basis for the Arbitrator's refusal to deduct 10% from the hypothetical sales price, for Sales Expenses that would be payable to ACG, under § 1(c)(i) of the Settlement Agreement. (A919-21) Specifically, the Magistrate found that deducting the 10% would reward ACG for breaching the contract. (A919-21)

### T. The District Court Adopts the Report and Recommendation Without a Reasoned Opinion

By Order, dated March 31, 2024, without a reasoned opinion, the District Court adopted the R&R in its entirety, denying ACG's motion to vacate the Award and granting Greenberg's motion to confirm the Award.

### U. The District Court's Subsequent Written Opinion and Judgment

Seven months later, in an Opinion & Order, dated October 29, 2024, the District Court issued a written opinion adopting the R&R and an accompanying Judgment. (A975 & 989) Other than extensive discussion of the standard of review, the District Court did not address ACG's arguments and essentially rubber stamped the Magistrate's recommendations, finding that the R&R "does not contain clear error." (A982-84)

The only argument by ACG which the District Court addressed was that the Arbitrator manifestly disregarded the law on merger clauses. Without engaging in any analysis, the District Court stated "[i]t is clear from the [Arbitrator's] decision

that [he] was aware of[] and applied [the merger clause], [and properly considered] the applicable law on [damages." (A983) The District Court found that, "even reviewing that decision *de novo*, [ACG's] arguments do not succeed." (A984)

## ARGUMENT

Under § 10(a) of the Federal Arbitration Act, 9 U.S.C.A. § 1, *et seq.*, a court may vacate an arbitration award on four statutory grounds, primarily involving fraud, corruption, partiality, misconduct, or imperfect execution or exceeding of arbitral powers. *See Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021) (citing 9 U.S.C. § 10). In addition, this Court has recognized non-statutory grounds for vacating an award, including manifest disregard of the terms of the parties' contract and manifest disregard of the law. *See Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019) (finding arbitration award manifestly disregarded contract and law); *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 143 (2d Cir. 2007) (finding arbitrators manifestly disregarded law on award of attorneys' fees under ADEA); *Copragri S.A. v. Agribusiness United DMCC*, No. 20 CIV. 5486 (LGS), 2021 WL 961751, at *5 (S.D.N.Y. Mar. 15, 2021) (finding arbitrators manifestly disregarded law concerning arbitrability).

## I.    STANDARD OF REVIEW

The Court reviews a district court's ruling confirming an arbitration award, including a review of the report and recommendation of the Magistrate Judge

under Rule 72(b)(3) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(C), *de novo* on issues of law and for clear error on findings of fact. *See Olin Holdings Ltd. v. State*, 73 F.4th 92, 108 (2d Cir. 2023); *Seneca Nation*, 988 F.3d at 625 ("We review de novo the district court's application of the manifest disregard standard to an arbitration award."); *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 536 (2d Cir. 2016); FED. R. CIV. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

## II. THE COURT SHOULD VACATE THE AWARD BECAUSE THE ARBITRATOR MANIFESTLY DISREGARDED THE UNAMBIGUOUS TERMS OF THE PARTIES' CONTRACT AND THE LAW OF MERGER CLAUSES

The Court should vacate the Award on grounds of the Arbitrator's manifest disregard of the unambiguous terms of the Settlement Agreement and manifest disregard of the law. In a results-oriented exercise, pursuant to his announcement to the parties after the close of the record, the Arbitrator simply nullified black-letter law that a merger clause precludes reliance upon prior representations—like alleged representations by ACG concerning the condition of the Painting—in order to justify Dr. Hunter's false "extraordinary assumption" that the Painting was in excellent condition, and thus Dr. Hunter's egregious $15 million valuation. The Arbitrator also ignored Dr. Hunter's admission that, in light of its poor physical condition, he overvalued the Painting. Finally, the Arbitrator nullified the plain

language of § 1(c) of the Settlement Agreement, which requires that the first 10% of the sale price of the Painting be allocated to ACG.

A court will vacate an arbitration award on grounds of manifest disregard of the law where "(1) the Arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the Arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 204 (2d Cir. 1998).[10] "This inquiry encompasses situations where the arbitrator's award is in manifest disregard of the terms of the [parties' relevant] agreement." *Weiss,* 939 F.3d at 109 (upholding vacatur of arbitration award which conflicted with plain language of contractual release); *see Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011) (stating that award may be vacated for manifest disregard of contract).

Vacatur of an award is warranted "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Seneca Nation*, 988 F.3d at 626 (quoting *Weiss*, 939 F.3d at 109; *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 25

---

[10] *See Seneca Nation*, 988 F.3d at 626 (stating, to meet this standard, the movant must show the "arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it"); *Porzig*, 497 F.3d at 143 (finding arbitrators manifestly disregarded law on award of attorneys' fees under ADEA); *Copragri*, 2021 WL 961751, at *5 (finding arbitrators manifestly disregarded law concerning arbitrability); *Sawtelle v. Waddell & Reed, Inc.*, 304 A.D.2d 103, 108, 754 N.Y.S.2d 264, 269 (2003) (finding arbitration award which disregarded law and imposed excessive punitive damages appropriately vacated).

(2d Cir. 1997) ("We will overturn an award where the arbitrator merely "mak[es] the right noises—noises of contract interpretation—while ignoring the clear meaning of contract terms."). In addition, under § 11(a) of the FAA, a court may correct an award that is irrational including "[w]here there was an evident material miscalculation of figures." 9 U.S.C. § 11(a); *Spear, Leeds & Kellogg v. Bullseye Sec., Inc.*, 291 A.D.2d 255, 256, 738 N.Y.S.2d 27, 29 (2002) (finding arbitration award must be set aside where irrational).

In *Weiss*, this Court recently upheld a district court's vacatur of an arbitration award on grounds that the arbitrator manifestly disregarded the law by ignoring the terms of the general release in a class action settlement and "dispensing [his] own brand of justice." *See Weiss*, 939 F.3d at 110. While the release, by its terms, extinguished all claims by the plaintiff arising prior to its date, the arbitrator illogically found that the release did not encompass claims arising from a set of facts different from those at issue in the prior action. Quoting the district court approvingly, this Court found that "the arbitrator's decision here ignored and contradicted an unambiguous term of the agreement—namely, the general release embodied in the Arthur Settlement." *Id.* "In light of the incoherence of the arbitrator's decision," the Court remanded to the district court, with instructions to remand the matter to the arbitrator to make specific findings and "to vacate or modify the arbitral award if necessary." *See id.* at 111.

36

In *Porzig*, this Court vacated an arbitral award where the panel disregarded statutory law under the ADEA on the award of attorneys' fees and fashioned its own form of rough justice, which included ordering the defendant to pay the plaintiff's attorney the amount of the attorney's prior contingent fee, rather that the much larger fee award due under the ADEA, and ordering the attorney to pay back to the client the prior contingent fee. *See Porzig*, 497 F.3d at 139-40 & 143. The Court rejected the arbitration panel's lawless decision to ignore the ADEA and limit the award of fees to amount of the contingent fee already paid to the plaintiff's lawyer. *See id.*

### A. THE ARBITRATOR DISREGARDED THE MERGER CLAUSE IN THE SETTLEMENT AGREEMENT AND RELATED LAW

First, in an attempt to justify Dr. Hunter's false assumption that the Painting was in good condition—and, thus, to justify the egregious $15 million valuation that even Dr. Hunter himself disavowed—the Arbitrator disregarded the plain language of the contract and black-letter law on the effect of a merger clause. The District Court thus should have vacated the Award on these grounds.

In § 6(e) of the Settlement Agreement, ACG represented that the Painting "is an authentic work of art by Andrea del Sarto, as described above in Section 1(a)." (A53-54) Section 1(a), in turn, provides the Painting's dimensions, materials and date, but makes no representation whatsoever concerning the Painting's physical condition. (A51) Nor can any representation concerning the physical condition of

the Painting be found anywhere else within the four corners of the contract. Finally, § 16 of the Settlement Agreement contains a merger clause that expressly precludes reliance upon any alleged prior representation or understanding, not set forth in the agreement itself. (A57)

It is black-letter law that the parties to a contract may incorporate a "merger" or "integration" clause affirming that there are no representations—other than those expressly set forth in the contract—upon which the parties are relying, and expressly disclaiming reliance upon any prior representation made before the time of contract. *See, e.g., AT&T Corp. v. Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 332 (S.D.N.Y. 2024) ("Atos's fraudulent inducement claim is also futile because the merger clause precludes Atos's reliance on AT&T's pre-Addendum proposals."); *In re KG Winddown, LLC*, 632 B.R. 448, 471–72 (Bankr. S.D.N.Y. 2021). ("A completely integrated contract precludes extrinsic proof to add to or vary its terms.").

> Courts and commentators addressing the substantive and procedural aspects of New York commercial litigation agree that the purpose of a general merger provision, typically containing the language ... that it "represents the entire understanding between the parties," is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing. The merger clause accomplishes this objective by establishing the parties' intent that the Agreement is to be considered a completely integrated writing. ***A completely integrated contract precludes extrinsic proof to add to or vary its terms.***

*Id.* (citing *Primex Int'l Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594, 657 N.Y.S.2d

385, 679 N.E.2d 624, 627 (1997)) (emphasis added). As the court stated in *Torres v. D'Alesso*, 80 A.D.3d 46, 53, 910 N.Y.S.2d 1, 7 (1st Dep't 2010), "[m]erger clauses are not mere boilerplate." By virtue of such a provision, "any claimed prior oral condition or agreement was necessarily extinguished at the moment the written contract became fully executed by both parties. At that point, the buyer could not expect to rely on any previous understanding or oral representation that was not included in the mutually executed written document." *Id.*

The Arbitrator was well aware of both the merger clause in the parties' contract and this fundamental principle of contract law. Indeed, during the arbitration hearing, **under the Arbitrator's own questioning**, Greenberg admitted that § 16 of the Settlement Agreement would bar him from relying upon alleged prior representations by Mr. Peck concerning the condition of the Painting. (A249-50 at 209-10)

Despite this unequivocal testimony by Greenberg, acknowledging black-letter law, the Arbitrator chose to ignore the merger clause and rewrite the parties' contract, as though it warranted that the Painting was in excellent condition, when it expressly did not. To do so, the Arbitrator relied upon disputed prior representations allegedly made long before the Settlement Agreement, stating "[i]t would be totally unfair to find that the [P]ainting was not in good condition **when [ACG] represented that it was** . . ." (A85) (emphasis added). These alleged prior

39

representations were in documents provided by Bonito (not ACG) and passed on to Greenberg by Mr. Simon long before the Settlement Agreement. (A79-80; A174-75 at 29-31; A186-87 75-78)[11]

In disregard of the merger clause and black-letter law, the Arbitrator treated such alleged prior representations about the condition of the Painting as though they were binding contract terms upon which Dr. Hunter could rely for purposes of the 2021 Appraisal. At most, such prior representations could have been grounds for rescission of the Settlement Agreement, but Greenberg did not seek rescission of the agreement.[12] Instead, Greenberg impermissibly sought contractual expectation damages based upon representations about the condition of the Painting which were precluded by the plain language of the Settlement Agreement.

In the R&R, the Magistrate relied upon the high standard of review of manifest disregard, stating that "[i]f the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract, the award must stand." (A917) The Magistrate then found "the arbitrator clearly exercised his

---

[11] As explained above, after Bonito provided these documents to ACG and Greenberg, their joint expert, Mr. Simon, informed Greenberg that he and the art conservator, Ms. Modestini, had serious concerns about the Painting's condition and that the Painting could be worth less than $ 1 million. (A173 at 24)

[12] If Greenberg was fraudulently induced to enter into the Settlement Agreement, based upon allegedly false representations concerning the condition of the Painting—which was not the case—Greenberg's remedy would have been rescission of the Settlement Agreement, not contractual expectation damages. *See, e.g., Solomon Cap., LLC v. Lion Biotechnologies, Inc.*, 171 A.D.3d 467, 468, 98 N.Y.S.3d 26, 28 (1st Dep't 2019) (finding plaintiff alleged defense of rescission of contract on grounds of fraudulent inducement).

discretion in interpreting the Agreement before him and found that the Painting was warranted to have been in good condition." (A917) However, as shown above, there is no colorable basis in the Settlement Agreement for a representation that the Painting was in good condition. The only conceivable basis—admitted by both the Arbitrator and the Magistrate—was in alleged prior representations barred by the merger clause. (A917) ("Dr. Hunter's assumptions about condition and authenticity were ***dictated by the representations made by [ACG] in the Settlement Agreement.***") (Emphasis added). Thus, contrary to the R&R, adopted by the District Court, there was no colorable basis for the Arbitrator's finding of any representation on the condition in the Settlement Agreement itself, and no colorable basis for the Arbitrator to find that Greenberg could rely upon alleged prior representations concerning condition that were precluded by the merger clause in § 16 of the Settlement Agreement.

Accordingly, as in *Weiss*, 939 F.3d at 110 and *Porzig*, 497 F.3d at 139-40 & 143, the Arbitrator manifestly disregarded the law. Had the Arbitrator duly enforced, rather than ignored, the merger clause, he would have found that Dr. Hunter was not entitled to assume that the Painting was in good condition, and thus that the 2019 Appraisal was relevant to—indeed, determinate of—the Painting's fair market value.

### B. The Arbitrator Disregarded Dr. Hunter's Disavowal of his Valuation of the Painting and Black-letter Law That a Plaintiff Bears the Burden of Proving a Specific Amount of Alleged Damages

Next, contrary to the R&R, adopted by the District Court, after Dr. Hunter disavowed his $15 million valuation, the Arbitrator also manifestly disregarded the law by awarding damages based upon Dr. Hunter's abandoned testimony.

At all times, a plaintiff bears the burden of proving the existence and amount of its alleged damages. § 22:12. AMOUNT OF DAMAGE, 28A N.Y. PRAC., CONTRACT LAW § 22:12 ("The plaintiff has the burden of showing the extent of the harm suffered."). Upon questioning by the Arbitrator himself, Dr. Hunter disavowed his $15 million valuation of the Painting—agreeing with the Arbitrator that, in light of the 2019 Appraisal, and the fact that Dr. Hunter's extraordinary assumptions concerning the condition of the Painting appeared not to be justified—it would have "an impact on the price." (A235 at 152) Although Dr. Hunter said he would not reduce his valuation to as low as $1.5 million, he did not attest to any new valuation number.[13]

The clear and unequivocal import of this testimony is that Dr. Hunter agreed

---

[13] During cross-examination, the Arbitrator stated to Dr. Hunter "it appears to me . . . that some of your extraordinary assumptions in your 2021 appraisal are not justified." (A235 at 152) He continued, "having seen the 2019 appraisal and the condition report, would that cause you to change your appraisal?" (*Id.*) In response, Dr. Hunter stated "Well, the things that have changed, clearly the title issue, the ownership issue is a problem, and condition seems to be more complicated than I was assuming, I was asked to assume. *So those two factors, yes, they would have an impact on the price.* I think I would, therefore, have -- *well, not certainly be as low as $1.5 million, but I would have tempered the valuations, yes.*" (*Id.*) (emphasis added).

with the Arbitrator that his extraordinary assumptions concerning condition and title were invalid, and thus "would have an impact on the price."[14] Greenberg, who bore the burden of proof on damages, never identified precisely what the impact on price would be. Thus, after stating on the record that Dr. Hunter's extraordinary assumptions were unwarranted, the Arbitrator illogically disregarded the law and facts and relied upon the $15 million valuation that Dr. Hunter expressly disavowed.

In light of Dr. Hunter's clear disavowal of his $15 million valuation of the Painting, contrary to the Arbitrator's decision, Greenberg failed to present a "stable foundation for a reasonable estimate of damages." *Cottam v. 6D Glob. Techs., Inc.*, 2022 WL 16908708, at *2 (2d Cir. Nov. 14, 2022) (finding plaintiff failed to provide a stable foundation for a reasonable estimate of damages arising from failure to deliver illiquid shares). At most, Greenberg presented only a purported range of damages, between $15 million and $ 1.5 million. (A235 at 152) Such imprecise "damage range" testimony impermissibly asks the fact finder to engage in "pure guesswork."[15] Thus, in the absence of Dr. Hunter's disavowed $15 million

---

[14] Notably, in this passage, Dr. Hunter admitted that his valuation was based upon an assumption concerning condition that he was "asked to assume," by Greenberg, although contrary facts known by Dr. Hunter and Winston Art Group.

[15] *See Exodus Partners, LLC v. Cooke*, No. 04 CIV. 10239 GEL, 2007 WL 120053, at *14 (S.D.N.Y. Jan. 17, 2007) (reversing damages award premised upon plaintiff's proposed range of damages between zero and $500,000); *see Trademark Rsch. Corp. v. Maxwell Online, Inc*., 995 F.2d 326, 334 (2d Cir. 1993) ("New York law does not countenance damage awards based on (continued...)

valuation, there simply was no credible testimony or evidence in the record to support any amount of alleged damages. At most, the evidence indicated that the Painting should be valued between Winston's prior $1.5 million valuation in the 2019 Appraisal and the $1.8 million hammer price in the Sotheby's auction, the only free market sale price of the Painting.

In the R&R, adopted by the District Court, the Magistrate downplayed Dr. Hunter's disavowal of his $15 million damages figure as a mere ***credibility issue***, within the discretion of the Arbitrator. (A919) But this is a gross distortion of the facts, and clearly erroneous. There is no question that, under examination by the Arbitrator himself, Dr. Hunter admitted the poor condition of the Painting would have an impact on price and recanted his valuation. After this, there was no colorable justification for the Arbitrator's continued reliance upon the spurious $15 million valuation in Dr. Hunter's 2021 Appraisal.

Accordingly, as in *Weiss*, 939 F.3d at 110 and *Porzig*, 497 F.3d at 139-40 & 143, contrary to the District Court's decision, the Arbitrator manifestly disregarded the law in finding that Greenberg came forward with proof of any amount of alleged damages as of any of the alleged breach dates.[16]

---

"[s]peculation or conjecture"; "there must be a definite and logical connection between what is proved and the damages a jury is asked to find.").

[16] In addition, Dr. Hunter made no attempt to present any expert testimony concerning the value of the Painting on any of the three alleged breach dates—instead selecting three wholly different dates in the future. Dr. Hunter's 2021 Appraisal states that it is effective only as of April 30, (continued...)

### C. THE ARBITRATOR DISREGARDED THE PLAIN LANGUAGE OF THE SETTLEMENT AGREEMENT AND BLACK-LETTER LAW THAT BREACH OF CONTRACT DAMAGES CANNOT PUT THE PLAINTIFF IN A BETTER POSITION THAN IF THE CONTRACT HAD BEEN PERFORMED

Next, contrary to the R&R, by ignoring the terms of the distribution waterfall in § 1(c) of the parties' contract—specifically the provision that the first 10% of any sales proceeds would be allocated to ACG "at any price level," on account of Sales Expenses—the Arbitrator manifestly disregarded the parties' contract and the principle that breach of contract damages cannot put the claimant in a better position than if the contract had been performed.

Under New York law, breach of contract damages "should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract," measured on the date of the breach.[17] An "injured party should not recover more from the breach than he would have gained had the contract been fully performed." *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 727 F. Supp. 2d 256, 286–87 (S.D.N.Y. 2010).

Section 1(c) of the Settlement Agreement provides that "at any price level, each and every dollar collected from the Sales Price shall be applied to pay sales

---

2021, May 31, 2021 and October 31, 2021. (A305 & 315)

[17] *See, e.g., Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ("New York courts are clear that breach of contract damages are measured from the date of the breach."); § 22:10. Date of the breach, 28A N.Y. PRAC., CONTRACT LAW § 22:10 ("The proper measure of damages is determined by the loss sustained or gain prevented at the time and place of the breach.").

expenses ("Sales Expenses"), calculated at ten percent of gross Sales Price, which shall be payable to ACG." (A51) Thus, in any hypothetical sale, ACG would always receive the first 10% of the sales price, before any distribution to Greenberg.

During the hearing, Greenberg admitted this fact, testifying:

> ·Q· And turning the page to -- actually,
> 17· ·turning the page to page 2, I guess we're on page
> 18· ·2.· The bottom of page 2, Section 1C, that's the
> 19· ·waterfall, correct?
> 20· · · ·A· That's the beginning of the waterfall.
> 21· · · ·Q· That's right.· **In the waterfall, the first**
> **22· ·item, there's a ten percent that came off the top**
> **23· ·payable to ACG; do you see that?**
> **24· · · ·A· Yes.**
> **25· · · ·Q· Okay.· And that came off the top no matter**
> **Page 203**
> **·1· ·what level the sales price went to; fair to say?**
> **·2· · · ·A· Yes.**

(A248 at 202-203) (emphasis added).

Despite this admission by Greenberg, and black-letter law, the Arbitrator simply disregarded the clear terms of the waterfall in § 1(c)(i) of the Settlement Agreement and—with no explanation—declined to deduct 10% off the top of the sales price before computing amounts due to Greenberg. (A86)

In the R&R, the Magistrate acknowledged that the Arbitrator provided no justification for this ruling, but chose to credit Greenberg's suggestion that applying the discount "would allow the breaching party to benefit from their wrongdoing." (A920) However, this justification makes no sense. As things turned out, there were neither sales proceeds nor expenses. But had there been sales

46

proceeds, there would have been expenses. Awarding Greenberg exactly what he would have received if the contract had been performed would not confer an unfair benefit upon ACG. But awarding Greenberg an additional 10% that would have been deducted under § 1(c) had the contract been performed would afford Greenberg an unfair windfall, contrary to the terms of the Settlement Agreement and the law of damages.

Accordingly, as in *Weiss*, 939 F.3d at 110 and *Porzig*, 497 F.3d at 139-40 & 143, there was no colorable justification for the Arbitrator's failure to deduct 10% off the top of the hypothetical sales price of the Painting, as required by § 1(c) of the Settlement Agreement. To the extent that the Court does not vacate the Award in its entirety, it should modify the Award to deduct the first 10% off of the hypothetical sales price of the Painting, as Sales Expenses.

## III. THE DISTRICT COURT ERRED IN FINDING THAT THE ARBITRATOR COMPLIED WITH §§ 10(a)(1) & (a)(3) OF THE FEDERAL ARBITRATION ACT

Finally, the Court should vacate the Award on grounds that the Arbitrator violated §§ 10(a)(1) & (a)(3) of the FAA by allowing Greenberg to procure the Award through "corruption, fraud or undue means" and by "refusing to hear evidence pertinent and material to the controversy."

Under § 10(a)(1) of the FAA, an arbitration award may be vacated on grounds that it was procured by "corruption, fraud or undue means." *See France v. Bernstein*, 43 F.4th 367, 378 (3d Cir. 2022) (vacating arbitration award in view of

perjured testimony and evidence not disclosed in discovery). "[O]btaining an award by perjured testimony constitutes fraud." *Id.* For purposes of § 10(a)(1) of the FAA, "knowingly conceal[ing] evidence" is "analogous to perjured testimony." *Id.* (quoting *Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 138 (D.N.J. 1976)).

Under § 10(a)(3) of the FAA, an arbitration award may be vacated "where the Arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C.A. § 10. "An arbitrator must give each of the parties to the dispute an adequate opportunity to present its evidence and argument." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (vacating arbitration award on grounds of procedural unfairness). A process that does not afford a party an opportunity to present relevant argument is procedurally unfair and is grounds for vacatur of the award. *See id.*; *Teamsters, Chauffeurs, Warehousemen & Helpers, Loc. Union No. 506 v. E.D. Clapp Corp.*, 551 F. Supp. 570, 578 (N.D.N.Y. 1982), aff'd sub nom. *Teamsters, Chauffers v. Ed Clapp Corp.*, 742 F.2d 1441 (2d Cir. 1983) (vacating arbitration award under 9 U.S.C. § 10(c) on grounds of refusal of arbitrator "to hear evidence pertinent and material to the controversy").

During the arbitration hearing, Dr. Hunter admitted that he violated the USPAP Ethical Rule by failing to disclose his prior, vastly lower $1.5 million 2019 Appraisal in his 2021 expert report. (A221 at 95) Under the circumstances, there is a strong inference that this omission was intentional and fraudulent. Had Respondents not learned of the 2019 Appraisal by other means, Dr. Hunter's prior $1.5 million valuation of the Painting never would have seen the light of day—and would not have been available as evidence at the hearing. Thus, the Arbitrator's contention that ACG's claim of fraud "makes no sense," adopted by the Magistrate and District Court, is erroneous. (A82, A915 & SPA7-8)

Contrary to the Magistrate's recommendation in the R&R, the District Court should have found that Dr. Hunter's admitted concealment of the vastly lower 2019 Appraisal in his expert report was an apparent fraud and should have provided ACG an opportunity to establish that Dr. Hunter's testimony under oath at the hearing—that he simply forgot the 2019 Appraisal—likewise was false. *See France v. Bernstein*, 43 F.4th 367, 378 (finding "knowingly conceal[ing] evidence" is "analogous to perjured testimony").

In view of an admitted ethical violation by Dr. Hunter—which the Arbitrator should have found unsettling at the very least—to prevent unfairness, the Arbitrator was required under § 10(a)(3) of the FAA to hear evidence rebutting Dr.

Hunter's claim that he simply forgot his recent prior of the same painting.[18] The credibility of Dr. Hunter as a witness—upon which the Arbitrator placed so much importance—depended heavily upon whether he was merely forgetful or a liar. The evidence needed to rebut Dr. Hunter's dubious claim—and to prove that he had intentionally concealed Winston's true valuation of the Painting—lay in the files of Winston, and in the testimony of just two of Dr. Hunter's colleagues. If the evidence shows that Dr. Hunter and his colleagues specifically discussed how to deal with the inconvenient 2019 Appraisal, it would be clear that Dr. Hunter lied under oath and had no credibility as a witness.[19]

Contrary to the Magistrate's finding in the R&R, cross examination of Dr. Hunter himself concerning the 2019 Appraisal could not provide "the same information" as objective documents found in the files of Winston or the testimony of Dr. Hunter's colleagues under oath. (A914-15) Such additional evidence was not cumulative, but (1) essential to the credibility of Dr. Hunter as a witness; and (2) needed to establish that Dr. Hunter in fact believed the Painting was worth no

---

[18] *See Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997) (vacating arbitration award on grounds of procedural unfairness). A process that does not afford a party an opportunity to present relevant argument is procedurally unfair and is grounds for vacatur of the award. *See id.*; *Teamsters, Chauffeurs, Warehousemen & Helpers, Loc. Union No. 506 v. E.D. Clapp Corp.*, 551 F. Supp. 570, 578 (N.D.N.Y. 1982), aff'd sub nom. *Teamsters, Chauffers v. Ed Clapp Corp.*, 742 F.2d 1441 (2d Cir. 1983) (vacating arbitration award under 9 U.S.C. § 10(c) on grounds of refusal of arbitrator "to hear evidence pertinent and material to the controversy").

[19] In addition, the testimony of Geza von Habsburg would further establish that the value of the Painting could be no more than $1.5 million.

more than $1.5 million. Thus, in refusing to hear such evidence, the Arbitrator violated § 10(a)(3) of the FAA.

Accordingly, the Court should vacate the Award under § 10(a) of the FAA, on grounds that Greenberg procured the Award through evident fraud on ACG and the Arbitrator, and that the Arbitrator unlawfully denied ACG the ability to adduce and present critical evidence concerning the value of the Painting, the credibility of Dr. Hunter, and Greenberg's unclean hands.

## CONCLUSION

For the reasons above, Appellants respectfully request that this Court (1) reverse the decision of the District Court confirming the arbitration award; (2) vacate the Judgment, as amended, in Respondents' favor; and (3) grant all such other and further relief as justice requires.

Respectfully submitted,

Dated:     New York, New York
           March 11, 2025

**PRESS KORAL LLP**

By: /s/ Matthew J. Press

Matthew J. Press
7 World Trade Center, 46th Floor
New York, New York 10007
212-922-1111
mpress@presskoral.com

*Attorneys for Respondents-Appellant*

## **CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)**

I hereby certify that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 12,687 words, excluding the parts of the brief exempted under Fed. R. Civ. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional typeface using Microsoft Word in 14 point font Times New Roman style.

Dated:      New York, New York
            March 11, 2025

                                    **PRESS KORAL LLP**

                                    By: /s/ Matthew J. Press

                                    Matthew J. Press
                                    7 World Trade Center, 46th Floor
                                    New York, New York 10007
                                    212-922-1111
                                    mpress@presskoral.com

                                    *Attorneys for Respondents-Appellant*

**SPECIAL APPENDIX**

**<u>Table of Contents</u>**

<u>**Page**</u>

Opinion and Order of the Honorable Jennifer H. Rearden,
dated October 29, 2024 ................................................. SPA1

Judgment of the United States District Court, Southern District of
New York, entered October 29, 2024 ....................................... SPA15

Amended Judgment of the United States District Court,
Southern District of New York, entered November 19, 2024 ... SPA17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOANS ON FINE ART LLC, | |
| Petitioner, | |
| -v.- | OPINION & ORDER |
| IAN S. PECK, ACG ARRANGEMENT SER-VICES LLC, ACG CAPITAL COMPANY, LLC, MODERN ART SERVICES, LLC, PA-TRIOT CREDIT COMPANY LLC, and PEG-ASUS CREDIT COMPANY LLC, | 23 Civ. 04143 (JHR) (JW) |
| Respondents. | |
| IAN S. PECK, ACG ARRANGEMENT SER-VICES LLC, ACG CAPITAL COMPANY, LLC, MODERN ART SERVICES, LLC, PA-TRIOT CREDIT COMPANY LLC, and PEG-ASUS CREDIT COMPANY LLC, | |
| Counter-Petitioners, | |
| -v.- | 23 Civ. 05717 (JHR) (JW) |
| GARY GREENBERG, ART FUND III LLC, COLORADO ART HOLDINGS LLC, GB FUND LLC, LOANS ON FINE ART LLC, and LOTUS INVESTMENT CORP., | |
| Counter-Respondents. | |

JENNIFER H. REARDEN, District Judge:

This action arises out of a $7,198,960.30 arbitral award (the "Award") issued by JAMS

arbitrator Kenneth Kramer (the "Arbitrator").  The Award was rendered in favor of Loans on

Fine Art LLC, Gary Greenberg, Art Fund III LLC, Colorado Art Holdings LLC, GB Fund LLC,

and Lotus Investment Corp. (collectively, the "Greenberg Parties"), against Ian S. Peck, ACG

Arrangement Services LLC, AGC Capital Company, LLC, Modern Art Services, LLC, Patriot

Credit Company LLC, and Pegasus Credit Company LLC (collectively, the "Peck Parties").

Loans on Fine Art LLC, the assignee of the Greenberg Parties' interests in the Award, filed a

petition to confirm the Award (the "Petition").  *See* ECF No. 6.  The Peck Parties opposed the

Petition and cross-moved to vacate the Award.[1]  *See* ECF No. 9.

The Court referred the parties' dueling motions and related applications to Magistrate

Judge Jennifer Willis, who issued a Report and Recommendation (the "R&R") recommending,

*inter alia*, that the Petition granted and that the cross-motion to vacate be denied.  *See* ECF

No. 47.  The Peck Parties have filed objections to the Report.  *See* ECF No. 53.  "Because the

[Peck Parties] largely recycle[] arguments that [they] made before Judge [Willis] and Judge

[Willis's] thorough and well-reasoned Report and Recommendation does not contain clear error,

[Loans on Fine Art LLC's] petition to confirm the arbitration award is GRANTED, [the Peck

Parties'] motion to vacate the arbitration award is DENIED, and the [] Award is CONFIRMED."

*Pioneer Navigation Ltd. v. Chem. Equip. Labs, Inc.*, No. 19 Civ. 2938 (GHW), 2020 WL

1031082, at *1 (S.D.N.Y. Mar. 3, 2020).

## DISCUSSION

"The Court refers the reader to the Report and Recommendation for the background of

the case, the facts, and the applicable law.  In view of [the Peck Parties'] objections, the Court

sets forth the following brief analysis."  *Tavares v. City of New York*, No. 08 Civ. 3782 (PAE),

2011 WL 5877548, at *1 (S.D.N.Y. Nov. 23, 2011).

### I.  Legal Standards

**A.    Objections to a Report and Recommendation**

A district court reviewing a magistrate judge's report and recommendation "may accept,

reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

---

[1] Patriot Credit Company LLC did not join the cross-motion to vacate.  For the reasons set forth in Loans on Fine Art LLC's papers, however, Patriot Credit is not exempt from a judgment by this Court.  *See, e.g.*, ECF No. 58 at 7.  Accordingly, notwithstanding Patriot Credit's non-movant status, any references to the "Peck Parties" in this Opinion & Order and in the corresponding Judgment include Patriot Credit.

judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). "Pursuant to 28 U.S.C. §

636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the

magistrate judge's report and recommendation." *Babcock v. Heath*, No. 11 Civ. 4631 (KMK),

2014 WL 4979448, at *3 (S.D.N.Y. Oct. 3, 2014). "These objections must be . . . filed 'within

14 days.'" *Id.* (alterations omitted) (quoting Fed. R. Civ. P. 72(b)(2)). The objections also "must

be 'specific and clearly aimed at particular findings in the magistrate judge's proposal.'" *Sistem*

*Muhendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*, No. 12 Civ. 4502 (ALC), 2020

WL 898215, at *2 (S.D.N.Y. Feb. 25, 2020) (quoting *Molefe v. KLM Royal Dutch Airlines*, 602

F. Supp. 2d 485, 487 (S.D.N.Y. 2009)).

     "When a timely and specific objection has been made, the court is obligated to review the

contested issues *de novo.*" *Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094,

at *1 (S.D.N.Y. June 25, 2013) (citing *Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir. 1998)).

"To the extent, however, that the party makes only conclusory or general arguments, or simply

reiterates the original arguments, the Court will review the Report strictly for clear error."

*Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 6865 (LTS), 2008 WL

4810043, at *1 (S.D.N.Y. Nov. 3, 2008); *see also Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451

(S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error

where objections are 'merely perfunctory responses,' argued in an attempt to 'engage the district

court in a rehashing of the same arguments set forth in the original petition.'" (quoting *Vega v.*

*Artuz*, No. 97 Civ. 3775 (LTS), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002))). "In clear

error review, the Court should reverse a finding only if it is 'left with the definite and firm

conviction that a mistake has been committed,' and not merely if it 'would have decided the case

differently.'" *Rodriguez v. Colvin*, No. 12 Civ. 931 (RJS), 2014 WL 5038410, at *4 (S.D.N.Y.

Sept. 29, 2014) (quoting *Easley v. Cromartie,* 532 U.S. 234, 242 (2001)).  This heightened

standard is applied because "'[i]t is improper for an objecting party to attempt to relitigate'

arguments made 'before the Magistrate Judge by submitting papers to a district court which are

nothing more than a rehashing of the same arguments.'" *Green v. Dep't of Educ. of City of N.Y.*,

No. 18 Civ. 10817 (AT), 2020 WL 5814187, at *2 (S.D.N.Y. Sept. 30, 2020) (quoting *Ortiz v.

Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008)), *aff'd*, 16 F.4th 1070 (2d Cir. 2021).

Indeed, "[o]bjections of this sort . . . would reduce the magistrate's work to something akin to a

meaningless dress rehearsal.  The purpose of the Federal Magistrates Act was to promote

efficiency of the judiciary, not undermine it by allowing parties to relitigate every argument

which it presented to the Magistrate Judge." *Shad v. Zachter PLLC*, No. 23 Civ. 10724 (GHW),

2024 WL 2061703, at *2 (S.D.N.Y. May 3, 2024) (quoting *Vega*, 2002 WL 31174466, at *1).

        "As to portions of an R&R to which no timely objection is made, this Court's review is

limited to a consideration of whether there is any 'clear error on the face of the record' that

precludes acceptance of the recommendations." *Belen v. Colvin*, No. 14 Civ. 6898 (PGG), 2020

WL 3056451, at *3 (S.D.N.Y. June 9, 2020) (quoting *Wingate v. Bloomberg*, No. 11 Civ. 188

(JPO), 2011 WL 5106009, at *1 (S.D.N.Y. Oct. 27, 2011)); *see also* Fed. R. Civ. P. 72(b)

advisory committee note ("When no timely objection is filed, the court need only satisfy itself

that there is no clear error on the face of the record in order to accept the recommendation.").

**B.    Vacating an Arbitration Award**

        "Vacatur of arbitral awards is extremely rare, and justifiably so." *Hamerslough v.

Hipple*, No. 10 Civ. 3056 (NRB), 2012 WL 5290318, at *3 (S.D.N.Y. Oct. 25, 2012).  "The

purpose of arbitration is to enhance efficiency and avoid costly, protracted litigation." *Id.*  "To

interfere with this process would frustrate the intent of the parties, and thwart the usefulness of

arbitration, making it 'the commencement, not the end, of litigation.'" *Id.* (quoting *Dufuerco Int'l Steel Trading Co. v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003)). "As a result, the power of a court to overturn an arbitration award is almost nonexistent." *Barzelatto v. Spire Sec.*, LLC, No. 19 Civ. 6238 (CM), 2019 WL 8889865, at *3 (S.D.N.Y. Nov. 5, 2019); *see also Aksman v. Greenwich Quantitative Rsch. LP*, 563 F. Supp. 3d 139, 149 (S.D.N.Y. 2021) ("Judicial review of such awards is 'severely limited, so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" (quoting *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins.*, 668 F.3d 60, 71-72 (2d Cir. 2012))).

In keeping with the above, "[a] party seeking to vacate an arbitral award faces an imposing standard of review." *Aksman*, 563 F. Supp. 3d at 149; *accord ACP Inv. Grp., LLC v. Blake*, No. 15 Civ. 9364 (JPO), 2016 WL 5947290, at *2 (S.D.N.Y. Oct. 13, 2016) ("[A] court's review of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence." (citation omitted)). "It is not enough for [a] petitioner[] to show that the [arbitrator] committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). The petitioner "'bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by' the Federal Arbitration Act ('FAA')." *NYKCool A.B. v. Pac. Fruit, Inc.*, 507 F. App'x 83, 85 (2d Cir. 2013) (quoting *Duferco Int'l Steel Trading*, 333 F.3d at 388). Pursuant to Section 10(a) of the FAA, these circumstances include, *inter alia*, (1) "where the award was procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1); and (2) "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence

pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced," *id.* § 10(a)(3).

"In addition to the [foregoing] statutory grounds set forth in the FAA, the Second Circuit has recognize[d] that a court may vacate an arbitration award rendered in 'manifest disregard' of the law." *Rai v. Barclays Cap. Inc.*, 739 F. Supp. 2d 364, 370 (S.D.N.Y. 2010), *aff'd*, 456 F. App'x 8 (2d Cir. 2011). "Vacatur of an arbitral award for manifest disregard of the law 'is a doctrine of last resort,' reserved for 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Aksman*, 563 F. Supp. 3d at 150 (quoting *Duferco Int'l Steel Trading*, 333 F.3d at 389). "Manifest disregard of the law 'means more than error or misunderstanding with respect to the law.'" *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986)). "To satisfy the manifest disregard standard, the movant must show that the arbitrators 'willfully flouted' governing law, and the reviewing court must make 'an objective determination' that the arbitrators disregarded a well-defined and clearly applicable legal principle*." Park Lane IBS, LLC v. Unbnd Grp. Pty Ltd.*, No. 23 Civ. 8620 (PKC), 2024 WL 4123515, at \*6 (S.D.N.Y. Sept. 9, 2024) (quoting *Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021)). "An arbitrator's decision cannot be vacated on the basis of manifest disregard if there is even a 'barely colorable justification for the outcome reached.'" *Glob. Gold Min., LLC v. Ayvazian*, 612 F. App'x 11, 14 (2d Cir. 2015) (quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009)); *see also Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) ("[T]he doctrine [of manifest disregard] 'gives extreme deference to arbitrators.'" (quoting *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997))).

## II.    The Peck Parties' Objections

### A.    Cross-Motion to Vacate

In seeking to vacate the Award, the Peck Parties present two main objections to the R&R.

First, they assert that the R&R "[e]rred in finding that the Arbitrator complied with §§ 10(a)(1)

& (a)(3) of the Federal Arbitration Act."  ECF No. 53 at 16.  Second, they argue that "[c]ontrary

to the R&R, the Arbitrator [] manifestly disregarded the law."  *Id.* at 20.  "Ultimately, the [Peck

Parties] have failed to meet the very high burden necessary to avoid confirmation of the Award."

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 878 F. Supp. 2d 459, 465

(S.D.N.Y. 2012).

### 1.    Section 10(a) of the Federal Arbitration Act

In pressing their first objection, the Peck Parties contend that "the Arbitrator violated §§

10(a)(1) & (a)(3) of the Federal Arbitration Act by 'refusing to hear evidence pertinent and

material to the controversy' and allowing [the Greenberg Parties] to procure the Award through

'corruption, fraud or undue means.'"  ECF No. 53 at 16.  "Th[is] 'objection' to the Report and

Recommendation is simply a rehashing of arguments presented to Judge [Willis]."  *Pioneer*

*Navigation Ltd.*, 2020 WL 1031082, at *5; *see, e.g.*, ECF No. 9 at 2 (in Peck Parties' cross-

motion to vacate presented to Judge Willis, arguing that "the Award should be vacated under

§ 10(a)(3) [because] . . . . the Arbitrator closed his eyes and ears to the evidence and instead

perversely credited [the Greenberg Parties' expert witness's] inflated, unlawful appraisal as the

basis for his damages award"); ECF No. 9 at 15 (urging in cross-motion to vacate that "[the

Greenberg Parties' expert witness's] 2021 Appraisal was procured by fraud," in violation of

§ 10(a)(1)); ECF No. 40 at 11 (maintaining at conference before Judge Willis that "the

circumstances and the facts that [the Peck Parties] assembled even with what [they] have should

# SPA8

give the Court pause as to enforcing an award on the grounds of Section 10(a)(3) and 10(a)(1)").
"Such objections warrant only clear error review." *Pioneer Navigation Ltd.*, 2020 WL 1031082,
at *5; *see Indymac Bank, F.S.B.*, 2008 WL 4810043, at *1; *Ortiz*, 558 F. Supp. 2d at 451; *Vega*,
2002 WL 31174466, at *1.  "In rejecting [the Peck Parties'] challenges, Judge [Willis] cited the
arbitration record extensively and applied the correct legal standards to determine whether the
[A]rbitrator . . . committed misconduct in refusing to hear evidence [and in whether the Award
was procured by fraud]." *Kellner v. Amazon*, No. 20 Civ. 6322 (AMD), 2022 WL 912683, at *2
(E.D.N.Y. Mar. 29, 2022), *aff'd*, No. 22-734, 2023 WL 2230288 (2d Cir. Feb. 27, 2023); *see,
e.g.*, ECF No. 47 at 9-11 (R&R thoroughly addressing Peck Parties' argument that "this Court
[should] . . . vacate the Arbitration Award under Section 10(a) of the FAA").

In sum, "[t]he Court has reviewed Judge [Willis's] thorough Report and
Recommendation and concludes that it does not contain clear error." *Pioneer Navigation Ltd.*,
2020 WL 1031082, at *5.

### 2.  Manifest Disregard of the Law

The Peck Parties' second objection—*viz.*, "the R&R [] mistakenly finds that, in issuing
the Award, the Arbitrator did not manifestly disregard the law," ECF No. 53 at 3—fares no
better.  In support of this objection, the Peck Parties advance three principal arguments: (1) "the
Arbitrator disregarded the merger clause in the settlement agreement," *id.* at 18; (2) "[t]he
Arbitrator disregarded black-letter law that a plaintiff bears the burden of proving a specific
amount of alleged damages," *id.* at 20; and (3) "[t]he Arbitrator disregarded black-letter law that
breach of contract damages cannot put the plaintiff in a better position than if the contract had
been performed," *id.* at 22.

"Those arguments . . . were [previously raised by the Peck Parties and] thoroughly addressed by the Magistrate Judge." *Ecoline, Inc. v. Loc. Union No. 12 of Int'l Ass'n of Heat & Frost Insulations & Asbestos Workers AFL-CIO*, No. 05 Civ. 2661 (DLI), 2006 WL 2524179, at *1 (E.D.N.Y. Aug. 30, 2006), *aff'd sub nom. Ecoline, Inc. v. Loc. Union No. 12 of Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers, AFL-CIO*, 271 F. App'x 70 (2d Cir. 2008); *see, e.g.*, ECF No. 9 at 19, 21, 23 (in Peck Parties' cross-motion to vacate, arguing that "[t]he Arbitrator ignored the merger clause in the settlement agreement"; "[t]he Arbitrator ignored black-letter law that a plaintiff bears the burden of proving a specific amount of alleged damages"; and "[t]he Arbitrator ignored black-letter law that breach of contract damages cannot put the plaintiff in a better position than if the contract had been performed"); ECF No. 47 at 8, 12-17 (R&R comprehensively analyzing the aforementioned arguments). "[The Peck Parties] offer[] no new arguments or research warranting modification of the Report [and Recommendation]." *Ecoline, Inc.*, 2006 WL 2524179, at *1. "Thus, the appropriate standard of review is for clear error." *Id.*

"The same conclusion would apply even if the Court reviewed Judge [Willis's] conclusions under a *de novo* standard of review." *Pioneer Navigation Ltd.*, 2020 WL 1031082, at *5. "Judge [Willis] employed the proper legal standards, accurately recited the facts, and correctly applied the law to the facts." *Id.* Indeed, far from "'willfully flout[ing]' governing law" or displaying "some egregious impropriety," *Park Lane IBS, LLC*, 2024 WL 4123515, at *6 (quoting *Seneca Nation of Indians*, 988 F.3d at 626), "[i]t is clear from the [Arbitrator's] decision that [he] was aware of[] and applied [the merger clause], [and properly considered] the applicable the law on [damages]," *Pioneer Navigation Ltd.*, 2020 WL 1031082, at *5. "[The Peck Parties] may disagree with [the Arbitrator's] application of [the merger clause and of] th[e]

law to the facts of this case." *Id.* "But that is not enough to show, as [the Peck Parties] must,

that the [Arbitrator] manifestly disregarded the law." *Id.* "Accordingly, even reviewing that

decision *de novo*, [the Peck Parties'] arguments do not succeed." *Id.*

**B.    Order of Attachment**

To the extent the Peck Parties continue to object to the R&R's recommendation that an

order of attachment be issued, the Court need not, and will not, address those objections.

"Attachment is a 'provisional remedy,' which, by definition, is only available *before* judgment is

entered." *Doolim Corp. v. R Doll, LLC*, No. 08 Civ. 1587 (BSJ) (HBP), 2009 WL 1514913, at

*8 (S.D.N.Y. May 29, 2009) (emphasis added) (citation omitted); N.Y. C.P.L.R. 6211(a) (order

of attachment may be granted "at any time prior to judgment."); *Remedy*, Black's Law

Dictionary (12th ed. 2024) (defining "provisional remedy" as "[a] temporary remedy awarded

*before* judgment and pending the action's disposition, *such as . . . an attachment*" (emphases

added)). "[B]ecause the Court is directing the Clerk of the Court to enter judgment for the

[Award], [the Peck Parties' objections] appear to be moot." *Gesualdi v. Scara-Mix, Inc.*, No. 14

Civ. 765 (JS), 2017 WL 5564673, at *10 (E.D.N.Y. Nov. 17, 2017); *cf., e.g., Citibank, N.A. v.

Aralpa Holdings Ltd.*, No. 22 Civ. 8842 (JLR), 2023 WL 5971144, at *18 (S.D.N.Y. Sept. 14,

2023) ("Having concluded that [petitioner] is entitled to judgment[,] . . . and since judgment will

be entered forthwith, the motion for an attachment prior to judgment is denied as moot.").

"Further, Rule 69 of the Federal Rules of Civil Procedure and New York law separately

provide post-judgment enforcement mechanisms." *Grp. One Ltd. v. GTE GmbH*, No. 20 Civ.

2205 (MKB) (JRC), 2023 WL 8472798, at *2 (E.D.N.Y. Sept. 15, 2023); *see, e.g.,* Fed. R. Civ.

P. 69 (statute governing the enforcement of money judgments). "At this stage, these post-

judgment mechanisms are the more appropriate vehicles for [Loans on Fine Art LLC] to ensure

it can collect the judgment." *Grp. One Ltd.*, 2023 WL 8472798, at *2. "With the forthcoming

judgment in hand, [Loans on Fine Art LLC] can pursue the appropriate enforcement mechanisms

under [federal and] New York law." *Gesualdi*, 2017 WL 5564673, at *10.

In view of the foregoing, an order of attachment will not issue as part of the Court's

judgment in this action.

### III.    Loans on Fine Art LLC's Petition to Confirm the Award

#### A.    Confirmation of the Award

"As noted above, [Loans on Fine Art LLC] ha[s] []moved for confirmation of the

[A]ward." *Elnenaey v. Fid. Brokerage Servs., LLC*, No. 23 Civ. 6970 (ER), 2024 WL 3675947,

at *8 (S.D.N.Y. Aug. 6, 2024). "Courts in the Southern District have held that 'upon the denial

of a motion for vacatur, the Court must confirm an arbitration award.'" *Cowin Tech. Co. v.

Amazon.com Servs., LLC*, No. 23 Civ. 3054 (ALC), 2024 WL 1076542, at *7 (S.D.N.Y. Mar. 12,

2024); *accord Beljakovic v. Melohn Properties, Inc.*, No. 04 Civ. 3694 (JMF), 2012 WL

5429438, at *4 (S.D.N.Y. Nov. 7, 2012), *aff'd*, 542 F. App'x 72 (2d Cir. 2013); *see also* 9 U.S.C.

§ 9 ("[T]he court must grant [an order seeking confirmation] unless the award is vacated,

modified, or corrected[.]"). "Here, [Loans on Fine Art LLC's] motion to confirm the Award [is]

granted, as the Court finds no grounds on which the Award should be vacated." *Beljakovic*,

2012 WL 5429438, at *4.

#### B.    Interest

##### 1.    Post-Award Pre-Judgment Interest

"Having confirmed the [Arbitrator's] Award, the Court must determine whether to allow

post-award, pre-judgment interest, and if so, at what rate." *Summers Lab'ys, Inc. v. Shionogi

Inc.*, No. 19 Civ. 2754 (AT), 2020 WL 423400, at *7 (S.D.N.Y. Jan. 27, 2020). "New York law

governs prejudgment interest here, both because this is a diversity case and because New York

law governs the parties' arbitration agreement." *Finger Lakes Bottling Co. v. Coors Brewing

Co.*, 748 F. Supp. 2d 286, 290 (S.D.N.Y. 2010); *In re Arb. Between Westchester Fire Ins. Co. v.

Massamont Ins. Agency, Inc.*, 420 F. Supp. 2d 223, 226 (S.D.N.Y. 2005) ("In diversity actions,

interest is to be calculated according to the statutory rate prescribed by the law governing the

contract."); *see* ECF Nos. 54-2 at 3, 54-12 at 8, 54-14 at 3, 57-3 at 22 (Award and parties'

submissions in underlying arbitration proceedings citing New York law).

"Post-award pre-judgment interest . . . is mandatory under New York law." *Sayigh v.

Pier 59 Studios, L.P.*, No. 11 Civ. 1453 (RA), 2015 WL 997692, at *13 (S.D.N.Y. Mar. 5, 2015).

Pursuant to N.Y. C.P.L.R. 5002, "[i]nterest shall be recovered upon the total sum awarded,

including interest to verdict, report or decision, in any action, from the date the verdict was

rendered or the report or decision was made to the date of entry of final judgment." N.Y.

C.P.L.R. 5002. "The arbitration award here is a 'verdict, report or decision,' as contemplated by

CPLR § . . . 5002." *Ganfer & Shore, LLP v. Witham*, No. 10 Civ. 4075 (DAB) (KNF), 2011 WL

321151, at *7 (S.D.N.Y. Jan. 6, 2011). "Interest under CPLR 5002 is a matter of right and is not

dependent upon the court's discretion or a specific demand for it in the complaint." *Sayigh*, 2015

WL 997692, at *13 (quoting *Goldberger v. Fischer,* 54 A.D.3d 955, 956 (2d Dep't 2008)); *see

also Sayigh*, 2015 WL 997692, at *13 ("CPLR § 5002 'provides for automatic entry of post-

decision interest by the Clerk of the Court[.]'" (citation omitted)). As to the applicable rate,

"New York law sets the rate of prejudgment interest at nine percent." *UiPath, Inc. v. Shanghai

Yunkuo Info. Tech. Co.*, No. 23 Civ. 7835 (LGS), 2024 WL 2853620, at *4 (S.D.N.Y. June 4,

2024); *see* N.Y. C.P.L.R. 5004 ("Interest shall be at the rate of nine per centum per annum,

except where otherwise provided by statute."). "Accordingly, [Loans on Fine Art LLC] is

awarded post-award pre-judgment interest at a rate of 9 percent per annum from the date of the [Award] to the date of the judgment." *Summers Lab'ys, Inc. v. Shionogi Inc.*, No. 19 Civ. 2754 (AT), 2020 WL 423400, at *7 (S.D.N.Y. Jan. 27, 2020).

### 2. Post-Judgment Interest

"Pursuant to 28 U.S.C. § 1961, 'the award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered.'" *Tru-Art Sign Co. v. Loc. 137 Sheet Metal Workers Int'l Ass'n*, 852 F.3d 217, 223 (2d Cir. 2017) (alterations omitted) (quoting *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996)). "Section 1961 applies to actions to confirm arbitration [awards]." *Access Bio, Inc. v. Div. 5 Labs, Inc.*, No. 23 Civ. 4820 (LGS), 2023 WL 7103305, at *3 (S.D.N.Y. Oct. 27, 2023); *see, e.g.*, *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004) ("There is no question but that the post-judgment interest awarded in this case was mandatory under § 1961."); *accord N.Y.C. Dist. Council of Carpenters v. Tried N True Interiors LLC*, No. 20 Civ. 51 (LGS), 2020 WL 1809323, at *4 (S.D.N.Y. Apr. 9, 2020). With respect to the governing rate, "post-judgment interest shall be computed at 'a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding' the date of judgment." *In re Arb. at N.Y. Under Rules of Soc'y of Mar. Arbs., Inc. between IMC Mar. Grp., Inc. & Russian Farm Cmty. Project*, No. 04 Civ. 3154 (RMB), 2004 WL 2914099, at *6 (S.D.N.Y. Dec. 14, 2004) (quoting 28 U.S.C. § 1961), *aff'd sub nom. IMC Mar. Grp., Inc. v. Russian Farm Cmty. Project*, 167 F. App'x 845 (2d Cir. 2006). Accordingly, "the Court awards [Loans on Fine Art LLC] interest accruing from the date of judgment until [the Peck Parties] ha[ve] satisfied the judgment at the federal rate specified in 28 U.S.C. § 1961(a)." *Trividia Health, Inc. v. Nipro Corp.*, No. 20 Civ. 8450 (VEC), 2022 WL 1744701, at *4 (S.D.N.Y. May

**SPA14**

31, 2022).

The Peck Parties have "not show[n] any reason why the mandatory post-award pre-judgment and post-judgment interest rates should not apply here." *Ganfer & Shore, LLP*, 2011 WL 321151, at *7. "Therefore, [Loans on Fine Art LLC] is entitled to: (i) pre-judgment interest from the date of the arbitration award, [April 5, 2023], to the entry of the final judgment, at the annual rate of nine percent; and (ii) post-judgment interest, from the entry of the final judgment in this action, until it is paid, at the rate provided in 28 U.S.C. § 1961(a)." *Id.*

## **CONCLUSION**

For the foregoing reasons, the Court accepts and adopts Magistrate Judge Jennifer Willis's thorough and well-reasoned Report and Recommendation. Loans on Fine Art LLC's petition to confirm the Award is GRANTED, the Peck Parties' cross-motion to vacate the Award is DENIED, and the Award is CONFIRMED.

The Clerk of Court is directed to enter judgment in favor of Loans on Fine Art LLC. The Clerk of Court is further directed to close this case.

SO ORDERED.

Dated:  October 29, 2024
        New York, New York

JENNIFER H. REARDEN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOANS ON FINE ART LLC,<br><br>          Petitioner,<br><br>      -v.-<br><br>IAN S. PECK, ACG ARRANGEMENT<br>SERVICES LLC, ACG CAPITAL<br>COMPANY, LLC, MODERN ART<br>SERVICES, LLC, PATRIOT CREDIT<br>COMPANY LLC, and PEGASUS CREDIT<br>COMPANY LLC,<br><br>          Respondents. | **JUDGMENT**<br><br>23 Civ. 04143 (JHR) (JW) |
| IAN S. PECK, ACG ARRANGEMENT<br>SERVICES LLC, ACG CAPITAL<br>COMPANY, LLC, MODERN ART<br>SERVICES, LLC, PATRIOT CREDIT<br>COMPANY LLC, and PEGASUS CREDIT<br>COMPANY LLC,<br><br>          Counter-Petitioners,<br><br>      -v.-<br><br>GARY GREENBERG, ART FUND III LLC,<br>COLORADO ART HOLDINGS LLC, GB<br>FUND LLC, LOANS ON FINE ART LLC, and<br>LOTUS INVESTMENT CORP.,<br><br>          Counter-Respondents. | 23 Civ. 05717 (JHR) (JW) |

JENNIFER H. REARDEN, District Judge:

        WHEREAS, on April 5, 2023, following an arbitration administered by JAMS pursuant

to its Comprehensive Arbitration Rules and Procedures, the presiding arbitrator issued a final

award of $7,198,960.30 (the "Award") in favor of Loans on Fine Art LLC, Gary Greenberg, Art

Fund III LLC, Colorado Art Holdings LLC, GB Fund LLC, and Lotus Investment Corp.

(collectively, the "Greenberg Parties") and against Ian S. Peck, ACG Arrangement Services

LLC, AGC Capital Company, LLC, Modern Art Services, LLC, Patriot Credit Company LLC,

and Pegasus Credit Company LLC (collectively, the "Peck Parties");

# SPA16

WHEREAS, on June 8, 2023, Loans on Fine Art LLC—the assignee of the Greenberg Parties' right, title, and interests in the Award—filed an amended petition to confirm the Award (the "Petition");

WHEREAS, on June 23, 2023, the Peck Parties filed a cross-motion to vacate the Award;

WHEREAS, on February 5, 2024, Magistrate Judge Jennifer Willis issued a Report and Recommendation recommending that the Petition be granted and the cross-motion to vacate be denied; it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the Court has accepted and adopted Magistrate Judge Willis's Report and Recommendation and the Petition is granted, the cross-motion to vacate is denied, the Award is confirmed, and judgment is hereby entered in favor of Loans on Fine Art LLC consisting of:

(1) the Award totaling $7,198,960.30;

(2)  $1,017,124.34 in post-Award pre-judgment interest (calculated at nine percent per annum from April 5, 2023 through entry of this Judgment); and

(3) post-judgment interest which shall accrue at the statutory rate pursuant to 28 U.S.C. § 1961.

SO ORDERED.

Dated: October 29, 2024
      New York, New York

JENNIFER H. REARDEN
United States District Judge

## SPA17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOANS ON FINE ART LLC, <br><br>        Petitioner, <br><br>    -v.- <br><br> IAN S. PECK; ACG ARRANGEMENT SERVICES, LLC; ACG CAPITAL COMPANY, LLC; MODERN ART SERVICES, LLC; PATRIOT CREDIT COMPANY, LLC; and PEGASUS CREDIT COMPANY, LLC, <br><br>        Respondents. | **AMENDED JUDGMENT** <br><br> 23 Civ. 04143 (JHR) (JW) |
| IAN S. PECK; ACG ARRANGEMENT SERVICES, LLC; ACG CAPITAL COMPANY, LLC; MODERN ART SERVICES, LLC; and PEGASUS CREDIT COMPANY, LLC, <br><br>      Counter-Petitioners, <br><br>    -v.- <br><br> GARY GREENBERG; ART FUND III LLC; COLORADO ART HOLDINGS LLC; GB FUND LLC; LOANS ON FINE ART LLC; and LOTUS INVESTMENT CORP., <br><br>      Counter-Respondents. | 23 Civ. 05717 (JHR) (JW) |

JENNIFER H. REARDEN, District Judge:

     WHEREAS, on April 5, 2023, following an arbitration administered by JAMS pursuant

to its Comprehensive Arbitration Rules and Procedures, the presiding arbitrator issued a final

award of $7,198,960.30 (the "Award") in favor of Loans on Fine Art LLC; Gary Greenberg; Art

Fund III LLC; Colorado Art Holdings LLC; GB Fund LLC; and Lotus Investment Corp.

(collectively, the "Greenberg Parties") and against Ian S. Peck; ACG Arrangement Services,

LLC; AGC Capital Company, LLC; Modern Art Services, LLC; Patriot Credit Company, LLC;

and Pegasus Credit Company, LLC (collectively, the "Peck Parties");

WHEREAS, on June 8, 2023, Loans on Fine Art LLC—the assignee of the Greenberg Parties' right, title, and interests in the Award—filed an amended petition to confirm the Award (the "Petition");

WHEREAS, on June 23, 2023, the Peck Parties filed a cross-motion to vacate the Award;

WHEREAS, on February 5, 2024, Magistrate Judge Jennifer Willis issued a Report and Recommendation recommending that the Petition be granted and the cross-motion to vacate be denied; it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the Court has accepted and adopted Magistrate Judge Willis's Report and Recommendation and the Petition is granted, the cross-motion to vacate is denied, the Award is confirmed, and judgment is hereby entered in favor of Loans on Fine Art LLC and against Ian S. Peck; ACG Arrangement Services, LLC; AGC Capital Company, LLC; Modern Art Services, LLC; Patriot Credit Company, LLC; and Pegasus Credit Company, LLC, consisting of:

(1) the Award totaling $7,198,960.30;

(2) $1,017,124.34 in post-Award pre-judgment interest (calculated at nine percent per annum from April 5, 2023 through October 29, 2024); and

(3) post-judgment interest which shall accrue at the statutory rate pursuant to 28 U.S.C. § 1961.

SO ORDERED.

Dated: November 19, 2024
New York, New York

JENNIFER H. REARDEN
United States District Judge